**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TY ALPER,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 24-1837 (DLF) |
| | ) |
| **DEPARTMENT OF JUSTICE,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>**CORRECTED REDACTED DECLARATION OF TY ALPER**</u>

I, Ty Alper, declare as follows:

1.      I am a member of the faculty at the University of California, Berkeley School of
Law, where I am the Co-Director of the Berkeley Law Clinical Program and the Co-Director of
the Berkeley Law Death Penalty Clinic.  My work address is 346 North Addition, U.C. Berkeley
School of Law, Berkeley, California 94720.  I am a member of the District of Columbia,
California, Alabama, and Georgia bars.

2.      I am one of Toforest Johnson's lawyers.  Mr. Johnson is a man who was
sentenced to death in Alabama in 1998.  I have represented Mr. Johnson since 2002.  I am also
the plaintiff in the above-captioned case.  I have personal knowledge regarding the facts
contained in this declaration.

**Background Regarding Pending FOIA Request**

3.      On February 15, 2024, I electronically submitted a request for records to the
Federal Bureau of investigation ("FBI") pursuant to the Freedom of Information Act ("FOIA").
I requested disclosure of all records and information related to the court case of *Alabama v.
Toforest Johnson*, Circuit Court of Jefferson County Case No. CC096-386.  My request was

accompanied by a signed waiver and certification of identity from Mr. Johnson. In my request, I also sought a waiver of processing fees, citing my affiliation with U.C. Berkeley School of Law.

4.      By letter dated February 20, 2024, the FBI acknowledged receipt of my FOIA request and assigned it FOIA Request No. 1609683-001. The FBI granted my request to be treated as an educational institution requester for purposes of fee assessments.

5.      On May 7, 2024, well past the statutorily imposed twenty working day deadline for making a determination, the FBI wrote to me via email to inform me that it had located approximately 513 pages potentially responsive to my request. The FBI also informed me at this time that the average time to complete my request was "at least 67 months."

6.      The FBI asked me via email if I was willing to reduce the scope of my request to reduce the time it would take to complete it. However, because the FBI provided no information about the nature of the 513 potentially responsive documents, I was not able to reduce the scope of my request. I asked to speak with the person at the FBI who was assigned to my request, but was told that I could only communicate with the FBI Negotiation Team's anonymous email account.

7.      By letter dated June 4, 2024, I requested that the FBI expedite its processing of my FOIA request. The grounds for this request were that, because Alabama is currently seeking Mr. Johnson's execution, his substantial due process rights would be impaired by failure to process the request immediately. I also explained that the information sought was not otherwise available.

8.      By letter dated June 11, 2024, the FBI informed me that I had "provided enough information concerning the statutory requirements permitting expedition" and that my request for expedited processing based upon "[t]he substantial loss of due process of rights" was granted.

9.      By email sent on June 20, 2024 to the address provided in the FBI's letter of June 11, 2024, I requested that the FBI inform me of when I might expect to receive the requested records.

10.      After the FBI failed to reply to my inquiry concerning the status of my FOIA request, I initiated this action on June 26, 2024.

11.      On August 7, 2024, Defendant, the U.S. Department of Justice, filed an answer to my complaint, admitting that I had exhausted the applicable and available administrative remedies with respect to its processing of my FOIA request.

12.      On August 30, 2024, the Court ordered the Defendant to complete its processing of the 513 pages on or before September 30, 2024.

13.      By letter dated September 30, 2024, the FBI informed me that there were zero responsive non-exempt records.  Instead, the FBI informed me that all responsive records were being withheld in their entirety pursuant to FOIA Exemption (b)(7)(A) and withheld in full or part pursuant to underlying FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

14.      On October 15, 2024, the Defendant and I submitted a joint status report notifying the Court that I was electing to proceed to summary judgment briefing.

15.      The Defendant filed its motion and memorandum in support of summary judgment on December 16, 2024.  In support of its motion, the Defendant submitted a declaration from Michael G. Seidel, the Section Chief of the FBI's Record/Information Dissemination Section, Information Management Division ("Seidel Declaration") (Dec. 16, 2024) (ECF No. 12-1).

16.      The Seidel Declaration states that all responsive records were categorically withheld pursuant to FOIA Exemption (b)(7)(A), which exempts from disclosure "records or

3

information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  The FBI asserted FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) as additional grounds for withholding information from the records categorically denied pursuant to Exemption 7(A).

17.    The FBI did not provide a *Vaughn* Index detailing the exempt information, alleging that further description of the information withheld beyond what was provided in the declaration "could reveal the actual exempt information."  Seidel Decl. ¶ 25.

18.    Because the FBI has not provided sufficient information for me to respond to the invocation of FOIA Exemptions (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E), this declaration provides information specifically responsive to the FBI's invocation of Exemption 7(A).

**Response to Defendant's Invocation of FOIA Exemption (b)(7)(A)**

19.    As the DOJ acknowledges, application of Exemption 7(A) requires the agency to demonstrate that a law enforcement proceeding is "pending or prospective" and that "disclosure of the information could reasonably be expected to cause some articulable harm to the proceeding."  *Voinche v. FBI*, 46 F. Supp 2d 26, 31 (D.D.C. 1999); Def.'s Mem. Supp. Summ. J. ("Def's Mem."), at 9 (Dec. 16, 2024) (ECF No. 12-1).

20.    As the DOJ also acknowledges, the principal purpose of Exemption 7(A) is to prevent disclosures that might "prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence."  *Maydak v. Dep't of Just.*, 218 F.3d 760, 762 (D.C. Cir. 2000); Def.'s Mem., at 9.

21.     According to the DOJ, the "pending or prospective" proceeding at issue here is the hypothetical new trial that might occur if Mr. Johnson successfully petitions either the state or federal court for a writ of habeas corpus.  The Seidel Declaration asserts that "[i]f Mr. Johnson prevails [in his habeas petitions], such a ruling could result in a new criminal trial and disclosure of the categorically withheld records would reveal previously unknown information concerning the criminal case and be reasonably expected to interfere with pending or prospective law enforcement proceedings."  Seidel Decl. ¶ 31.

22.     The records the FBI seeks to withhold are contained in an FBI investigative file pertaining to assistance the FBI provided to the Jefferson County Sheriff's Department during its investigation into the murder of a Jefferson County Deputy Sheriff in 1995.  Toforest Johnson was convicted and sentenced to death for the murder in 1998.

23.     The agency has asserted that "none of the responsive material can be released without jeopardizing further prosecutive efforts."  Seidel Decl. ¶ 39.

24.     More specifically, the FBI argues that "release of these records would allow Mr. Johnson to critically analyze documents and information collected or shared between the originating law enforcement agency and the FBI concerning the investigation.  Mr. Johnson would then possess the unique advantage of knowing the details surrounding the criminal activities, the identities of witnesses and the direct and circumstantial evidence of the potential criminal activities.  Mr. Johnson could therefore use the released information to his advantage to destroy evidence, intimidate witnesses, and/or evade the investigative efforts."  Seidel Decl. ¶ 40.

25.     As explained below, the Seidel Declaration assumes, incorrectly, that federal prosecutors prosecuted Mr. Johnson in federal court. Seidel Decl. ¶ 33.  Indeed, it appears the FBI's response consists primarily of boilerplate language the agency uses in typical

Exemption 7(A) cases involving contested pretrial federal prosecutions.  This is not a typical federal case.  It is not a federal case at all.  The FBI's purported justifications for withholding under Exemption 7(A) are not applicable to this state court case, in which the elected District Attorney who would be responsible for any retrial has himself petitioned the court to grant a new trial, and where state prosecutors, at the direction of the state court, have already provided the defendant and his attorneys with the State's entire unredacted investigative file.

26.    For a number of reasons detailed below, there is no danger that the release of the withheld records would interfere in any way with a future hypothetical state court retrial in Mr. Johnson's case.

27.    *First*, the Seidel Declaration is premised on a basic underlying assertion that is simply not true.  The Seidel Declaration states that the records it has identified "pertain to law enforcement proceedings and the prosecution of the subject *in United States District Court* for the murder of a Jefferson County Deputy."  Seidel Decl. ¶ 33 (emphasis added).  This is not true.  The local District Attorney prosecuted Mr. Johnson in *state* court.  Any retrial awarded in this case would take place in the Circuit Court of Jefferson County, Alabama – not the United States District Court.  At no time have federal authorities prosecuted, or sought to prosecute, Mr. Johnson at all, let alone in federal court. Although the Defendant notes that the FBI is the "primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency," Def.'s Mem., at 8, the prosecution at issue here is purely a state prosecution.  The FBI's role in this case was merely to aid local law enforcement in the investigation of the case.

28.    *Second*, the Seidel Declaration alleges that the withheld documents containing, among other things, the results of FBI interviews, would be used "at the discretion of the U.S.

Government's prosecution efforts."  Seidel Decl. ¶ 37, n.13.  At least with respect to the prosecution of Toforest Johnson, the U.S. Government has no role whatsoever.  Neither the federal government nor the FBI would be involved in decisions related to a potential re-trial of Mr. Johnson should he successfully petition the courts for a new trial.  That responsibility would fall solely to state prosecutors in the Office of the Jefferson County District Attorney in Birmingham, Alabama.

29.    *Third*, as detailed below, the Jefferson County District Attorney's Office has taken a public position in *support* of a new trial in this case.  The District Attorney's Office has publicly stated that "[a] thorough review and investigation of the entire case leave no confidence in the integrity of Johnson's conviction."  Exhibit A.  The District Attorney's Office is actively seeking to have Mr. Johnson's conviction and death sentence overturned.  Thus, this is a highly unusual case in which the entity that would be responsible for prosecuting Mr. Johnson *agrees with him* that a new trial is warranted and has filed a public request asking the state court to award him a new trial.  Under these circumstances, the FBI's concern for a potential retrial that it mistakenly believes would take place in federal court is entitled to no weight.

30.    *Fourth*, the agency's concerns about interference and confidentiality are non-existent in a case and jurisdiction where, as further detailed below, a) prosecutors employ an "open file" discovery policy in capital cases, so Mr. Johnson would be entitled to the records anyway were he to face a retrial; b) unredacted copies of some FBI records were already provided to lawyers in pretrial discovery almost thirty years ago; c) the State has already been ordered to turn over its entire investigation file in this case and has already disclosed thousands of unredacted investigative documents to Mr. Johnson's counsel, including unredacted FBI records; and d) despite the disclosure of some of the existing FBI records (which contain the

names of both FBI agents and witnesses), none of the concerns the agency has raised have materialized.

## Background on the Prosecution of Toforest Johnson

31.     Toforest Johnson was convicted of capital murder and sentenced to death in 1998 for the shooting of Jefferson County Deputy Sheriff William G. Hardy in Birmingham, Alabama. He has always claimed he was across town at the time of the shooting and that he had nothing to do with Deputy Hardy's murder.  His postconviction litigation seeking a new trial has been joined by the original lead trial prosecutor who tried his case, the current elected District Attorney whose office prosecuted the case, and amicus briefs from many different groups of interested parties.

32.     Amicus briefs in support of Mr. Johnson's request for a new trial have been filed on behalf of former Alabama prosecutors; former Justices of the Alabama Supreme Court, former judges of the Alabama Court of Criminal Appeals, and former Presidents of the Alabama Bar Association; The Innocence Project; Greater Birmingham Ministries and other members of the Jefferson County faith community; Alabama Legal Scholars; The Jefferson County Public Defender's Office, Alabama Criminal Defense Lawyers Association, Greater Birmingham Criminal Defense Lawyers Association, and private criminal defense counsel; the Alabama Appleseed Center for Law and Justice; and more than 100 Alabama Law Students.

33.     Mr. Johnson's case is the subject of a critically acclaimed podcast, *Earwitness*, and his case has received extensive local, national, and international media attention. *See* www.toforestjohnson.com.

34.     In short, this is a high-profile death row innocence case in which there is great public interest.  *See Roth v. Dep't of Just.*, 642 F.3d 1161, 1175-76 (D.C. Cir. 2001) (analyzing

FOIA Exemption 7(C) and holding that "the public's interest in knowing whether the FBI is withholding information that could corroborate a death-row inmate's claim of innocence" was significant, particularly because "[i]n recent years, high-profile exonerations of death-row inmates have generated considerable public interest in the potential innocence of individuals sentenced to death").

35.    I provide below a brief background of the case for context.  The following information about the case is based on public documents and is consistent with the recently-released report of the Jefferson County District Attorney's Office.  Exhibit A.

36.    Deputy William G. Hardy was shot and killed in the parking lot of a hotel in Birmingham in the early morning hours of July 19, 1995.  There were no eyewitnesses to the crime, no physical evidence was found, and no murder weapon was ever recovered.

37.    Three and a half hours after Deputy Hardy was killed, and miles away from the crime scene, officers pulled over Toforest Johnson, who was riding in a car with a man named Ardragus Ford and two women, Yolanda Chambers and Latanya Henderson.  After officers patted the four down and found no weapons, Mr. Ford and the two women were released; Mr. Johnson was arrested on an outstanding traffic warrant.

38.    A week later, Ms. Chambers, who was fifteen years old, went to the police seeking the $20,000 reward that had been offered in the case.  Police interviewed Ms. Chambers at least twenty times, and her accounts were inconsistent and perpetually changing; she implicated seven different men in the shooting, including Mr. Johnson.  She later admitted to telling "hundreds of lies" to the police because officers pressured her and threatened her with jail time.  Nevertheless, based on interviews with Ms. Chambers, police charged four men with

capital murder: Quintez Wilson, Omar Berry, Mr. Ford, and Mr. Johnson.  Throughout the next
three years, the State changed its theory of the case repeatedly.

39.     Quintez Wilson and Omar Berry spent eighteen months in custody before
prosecutors dropped all charges against them.

40.     The State proceeded to prosecute Ardragus Ford and Toforest Johnson for capital
murder.  Both men were tried twice, with their first trials ending in mistrials.  Jeff Wallace, an
assistant district attorney for Jefferson County, served as the lead trial prosecutor at each trial.

41.     At the first trial of Mr. Ford in November of 1997, the State argued that Mr. Ford
alone shot Deputy Hardy.  The State presented the testimony of Yolanda Chambers, who claimed
that she saw Mr. Ford shoot Deputy Hardy multiple times.  The jury could not reach a verdict.

42.     The State then tried Mr. Johnson in December of 1997, presenting the testimony
of Violet Ellison, a woman who claimed that she had overheard a three-way jail phone call her
daughter had placed for a friend of hers at the jail.  On this call, Ms. Ellison allegedly heard a
man who identified himself as "Toforest" say that he and "Fellow" (a nickname for Quintez
Wilson) each shot Deputy Hardy once.  The State had already dismissed all charges against
Mr. Wilson, and the prosecutor argued in closing that despite Ms. Ellison's testimony,
Mr. Johnson was the only shooter.  The jury could not reach a verdict.

43.     The State tried Mr. Johnson a second time in August of 1998, relying again on
Ms. Ellison's testimony but this time arguing that both Mr. Johnson and Mr. Wilson shot Deputy
Hardy.  The jury convicted Mr. Johnson. After a brief penalty phase, ten jurors recommended a
death sentence and two jurors recommended life in prison without parole.  The court then held a
judicial sentencing hearing and imposed a death sentence.  Mr. Johnson has been incarcerated on
Death Row at Holman Correctional Facility in Atmore, Alabama ever since.

44.     After Mr. Johnson's conviction, the State tried Mr. Ford a second time.  At this trial, the State abandoned the theory of the murder that it presented to Mr. Johnson's jury. Instead, it turned once again to Yolanda Chambers, who testified that Mr. Ford was the one who shot at Deputy Hardy. The jury found Mr. Ford not guilty.

45.     The State's case against Mr. Johnson hinged on the testimony of Violet Ellison, which was inconsistent with the physical evidence at the time of trial and has been further undermined since.  For example, at trial, Ms. Ellison claimed that the man on the phone said that there were two shooters, even though the State's other evidence indicated that this was a one-shooter case.  Ms. Ellison also claimed to have taken contemporaneous notes during the call that she said she overheard, but her notes included information that she learned from outside sources.

46.     Then, in 2019, after representing for years that its files contained "[n]othing about anyone applying for a reward or being granted a reward," the State disclosed for the first time that it had paid Violet Ellison $5,000 for her testimony without informing the defense.  Court records also confirm that Ms. Ellison served as a key witness for the State in several other criminal cases pending at the same time as Mr. Johnson's case, including one Jefferson County case that resulted in an acquittal and another that was dismissed prior to trial.

47.     At a hearing in 2014, Jeff Wallace, the lead trial prosecutor, testified: "I don't think the State's case was very strong, because it depended on the testimony of Violet Ellison."

48.     After the Alabama appellate courts upheld his conviction and death sentence on direct appeal, Mr. Johnson initiated postconviction proceedings in both state and federal court. He has a postconviction petition pending in Jefferson County Circuit Court and a federal habeas corpus petition pending in the U.S. District Court for the Northern District of Alabama.  Along with Mr. Johnson's other attorneys, I am counsel for Mr. Johnson in each of these proceedings.

**District Attorney's Conviction Integrity Review**

49.     In 2019, the Jefferson County District Attorney became aware of concerns with Johnson's conviction and launched an independent review of the case.  The process included "a review of the entire prosecution and law enforcement file in this matter; trial and post-conviction transcripts; pleadings filed by the State and the defense; interviews with trial prosecutors, defense and post-conviction counsel, and witnesses; recordings of witness interviews with investigators; and consultations with the victim's family."  Exhibit A.

50.     At the conclusion of the process in 2020, the District Attorney informed the circuit court that Johnson should be granted a new trial "in the interest of justice."  Exhibit B. The District Attorney's Office included in its public filing that its request for a new trial was joined by the original lead trial prosecutor, Mr. Wallace.

51.     The District Attorney produced a report detailing the bases for its conclusion on May 20, 2024. The report summarized the Office's findings as follows:

> The conclusion that Johnson's conviction is fundamentally unreliable is not based on any one fact. Instead, it is based on the totality of the facts. Johnson's conviction hinges on [Violet] Ellison's account. And we know now that the physical evidence contradicts Ellison's account *and* that Ellison's notes contained information based on other sources *and* that credible alibi witnesses place Johnson elsewhere at the time of the crime *and* that Ellison was paid $5,000 for her testimony. We also know that Ellison was not believed by law enforcement initially *and* that a different theory of the case that contradicted her account was pursued after Johnson's trial *and* that the lead prosecutor now has such grave concerns about Ellison's account that he supports a new trial for Johnson.

Exhibit A.

52.     In the final section of the report, the District Attorney explained that "[t]he evidence in this case has unraveled over 20 years," and "[i]t has not been possible, until recently, to fully appreciate the full extent to which the foundation of this conviction has disintegrated." The District Attorney concluded: "A thorough review and investigation of the entire case leaves

no confidence in the integrity of Johnson's conviction.  The interest of justice demands that Johnson be granted a new trial." Exhibit A.

### Open File Discovery in Jefferson County

53.    It is my understanding and belief that, in capital murder prosecutions in Jefferson County, Alabama, prosecutors employ an open file discovery policy, whereby defense counsel is entitled, prior to trial, to the investigative reports and other non-work-product files in the possession of the prosecution and law enforcement agencies involved in the case.

54.    It is further my understanding and belief that if Mr. Johnson were to be granted a new trial in this case, he would be entitled under this open file discovery policy to any records of the FBI's investigation of this case that were in the possession of local prosecutors.

55.    At the time Mr. Johnson was originally prosecuted, his lawyers and the lawyers for his co-defendants received extensive pretrial discovery, including hundreds if not thousands of unredacted police reports and investigative notes.  As part of that discovery, these lawyers were provided with, among other documents, unredacted records related to the FBI's investigation of this case.

### Post-Conviction Discovery Already Ordered in this Case

56.    Postconviction discovery in Alabama is more limited than pretrial discovery. Typically, a prisoner like Mr. Johnson who has initiated a postconviction proceeding is only entitled to discovery if he can establish "good cause" to suggest that the discovery requested relates to a claim for which the court has granted an evidentiary hearing.  *See, e.g., Ex parte Land*, 775 So.2d 847, 852 (Ala. 2000).

57.    In 2018, during state postconviction proceedings, the Jefferson County Circuit Judge presiding over Mr. Johnson's case ordered state prosecutors and law enforcement to

provide Johnson's counsel with every record in its possession related not only to the prosecution

of Mr. Johnson but also to the investigation into the murder of Deputy Hardy.  Exhibit C.

58.    Specifically, the court ordered the following:

The Court ORDERS the Office of the Jefferson County District Attorney to provide
Mr. Johnson's counsel access to its complete file from this case.

The Court ORDERS the Office of the Jefferson County Sheriff to provide
Mr. Johnson's counsel access to its complete file concerning the investigation into
the murder of Deputy William Hardy.

The Court ORDERS the Birmingham Police Department to provide Mr. Johnson's
counsel access to its complete file concerning the investigation into the murder of
Deputy William Hardy.

59.    The state court judge ordered discovery of the entire unredacted investigative file

in Mr. Johnson's case, as well as the prosecutor's own files, because they were potentially

relevant to the claim that the State had withheld from the defense information about the reward

payment to the State's key witness.  Later, the judge limited her discovery order to exclude grand

jury testimony and the prosecutor's own work product. Everything else in the State's files—

including all police reports and police officer notes—were ordered disclosed to Mr. Johnson's

attorneys.

60.    At the time, the judge—a former prosecutor in Jefferson County—noted on the

record that all of the documents she was ordering disclosed would be disclosable, pretrial, under

the open file policy in capital cases referenced above.  The judge stated that "traditionally here

the district attorney's office files open file [discovery.]".  Exhibit D.

61.    Pursuant to the court's order, the District Attorney's Office disclosed to

Mr. Johnson's legal team approximately 17,000 pages from the DA's files and approximately

7,130 pages and 150 cassette tapes from the Jefferson County Sheriff County's Office.

62.     The documents disclosed to Mr. Johnson and his legal team in 2018 included hundreds of pages of unredacted police reports and the handwritten notes of police investigators. They included the names, phone numbers, addresses, and social security numbers of hundreds of potential witnesses in the case.  They included notes and memos containing prosecution and law enforcement strategy in the case.  None of the disclosed documents were redacted or subject to any kind of protective order.  All of them are currently in the possession of Mr. Johnson's legal team.

63.     The documents disclosed to Mr. Johnson and his legal team in 2018 also included thirty-four pages of FBI records.  Because some of the documents are duplicated, the thirty-four pages comprise twenty pages of original material.  The documents are completely unredacted. They are attached in their entirety as Exhibit E.  Although the FBI records in Mr. Johnson's possession are not subject to any protective order, they are being filed under seal pursuant to Local Civil Rule 5.4(f) as they contain unredacted personal identifiers.

64.     The particular postconviction case in which the above discovery was disclosed has now concluded.  There is no pending discovery order to which the FBI is subject.  Therefore, Mr. Johnson has no other means to access the FBI documents related to the investigation of his case except through the instant FOIA request.

65.     I am further aware that at least some of these FBI records were provided— unredacted—in pretrial discovery to counsel for Mr. Johnson and his co-defendant Ardragus Ford prior to their trials in 1997, 1998, and 1999.

**Information Contained in FBI Records That Have Already Been Disclosed**

66.     The unredacted FBI records that have already been disclosed in this state prosecution relate to the FBI's request that Spanish law enforcement assist in interviewing

Michael Ansley, a former professional basketball player who was present at the motel where Deputy Hardy was shot on the morning of the murder.  In October of 1995, Mr. Ansley was in Madrid preparing to play professional basketball for a Spanish team.  Exhibit E.

67.    More specifically, the original material from the FBI is comprised of the following:

a) A seven-page document dated October 5, 1995, addressed to the FBI's Legal Attaché in Madrid from Squad 3 of the FBI's Birmingham field office. The document lists the names of two FBI agents: the contact for the Birmingham office and agent who drafted the document, and the agent who approved the document. The document requests that the legal attaché, who is named in the document, coordinate with Spanish law enforcement authorities to interview Michael Ansley. It contains an unredacted summary of the information known to the FBI about Deputy Hardy's murder and Ansley's relationship to the murder. The summary states that local law enforcement "suspect[ed] that Ansley ha[d] knowledge of the events that occurred in the parking lot of the motel before, during, and after the shooting, but ha[d] been reluctant to divulge this information for fear of harming his professional basketball career." It further explains that local law enforcement believed the primary suspects in the murder of Deputy Hardy, who are named in the document, were at the motel that night to conduct a narcotics transaction with other individuals, who are also named in the document and potentially Michael Ansley himself. Following this summary, the document lists twenty-eight specific questions for Ansley and requests that foreign investigators base their interview of Ansley around the listed questions. The questions name additional witnesses and are primarily about Ansley's relationship with the suspects and what he was doing in the time leading up to, during, and in the days following the murder.

b) A three-page document dated October 6, 1995 on FBI letterhead, providing the same summary of Ansley's relationship to Deputy Hardy's murder as was provided to Spanish law enforcement in the seven-page document dated October 5, 1995.

c) A ten-page document transcribed on January 23, 1996, summarizing the interview of Michael Ansley that took place on January 20, 1996. The first page of the document contains the full name of the agent responsible for the interview and his signature.

68.    The Jefferson County Sheriff's file provided to Mr. Johnson's counsel also includes a memorandum from lead investigator and Jefferson County Sheriff Deputy Tony Richardson to an FBI Special Agent, whose unredacted name appears in the document.  The memorandum is dated October 5, 1995, and it contains Richardson's initial request for assistance from the FBI.

### Other Sources of Information About Michael Ansley

69.    As it appears that at least some of the records in possession of the FBI pertain to the FBI's assistance investigating Michael Ansley, I recount here other public information about Mr. Ansley's involvement in the case for the purpose of demonstrating that the FBI's concerns about confidentiality of witnesses are ill-founded.

70.    Mr. Ansley was a prominent figure in the investigation of Deputy Hardy's murder. The media publicized information about Mr. Ansley's proximity to the murder prior to the FBI's interview of him.  Both the *Birmingham News* and the *Birmingham Post-Herald* published stories on August 10, 1995 reporting that Ansley was being questioned about the murder because he had been at the hotel on the night of the shooting.  Exhibit F.

71.    Published opinions from the Alabama Court of Criminal Appeals also repeatedly mention Mr. Ansley's role in the investigation.  *See Johnson v. State*, 823 So. 2d 1, 10-11, 13, 28-29, 32, 43 (Ala. Crim. App. 2001); *Johnson v. State*, 379 So. 3d 994, 1004-05, 1007 (Ala. Crim. App. 2007).

72.    In addition, the files from the Jefferson County District Attorney and Jefferson County Sheriff's Department that have already been disclosed contain approximately forty pages detailing the investigation that state law enforcement conducted involving Mr. Ansley, as well as two twenty-minute audio recordings of interviews with Mr. Ansley.

**No Allegations of Witness Intimidation or Evidence Tampering**

73.    Mr. Johnson and his trial attorneys had access to the investigative files in this case as early as 1995, pursuant to the pretrial discovery practices and policy in Jefferson County.  At least 100 witnesses are identified by name in these files.

74.    In addition, Mr. Johnson and his current attorneys have had access to unredacted FBI records – as well as the entire unredacted investigative file in the possession of state prosecutors and law enforcement offices – for more than six years.

75.    In addition, twenty individuals testified publicly in Mr. Johnson's criminal trial, and several more were identified in the media coverage of the case.

76.    There have been no allegations that Mr. Johnson or anyone connected with his case – or any third parties – has attempted to intimidate witnesses, harm witnesses, destroy evidence, or alter evidence.

**Response to FBI's Stated Concerns About Disclosing Records**

77.    The DOJ has argued that disclosure of the FBI records at issue might "prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence." *Maydak v. Dep't of Just.*, 218 F.3d 760, 762 (D.C. Cir. 2000); Def.'s Mem., at 9.

78.    As noted above, the FBI's response appears to be boilerplate language used in typical federal prosecutions. To be clear, this is a state prosecution.  Neither FBI nor the DOJ is involved in the case against Mr. Johnson, nor would they be if he were awarded a retrial in state court, except to the extent that the FBI assisted local law enforcement back in the mid-1990s. Moreover, the only "pending" proceedings are ones Mr. Johnson himself has initiated. The only

"prospective" proceeding is a new trial that the prosecutor himself is actively seeking from the courts.

79.     The prosecution's "case in court" as well as its "evidence and strategies" and "the nature, scope, direction, and focus of its investigations" have long since been revealed to Mr. Johnson and his legal team – over the course of multiple trials in state court and almost two decades of postconviction litigation.  Nothing about the disclosure of the FBI's investigative files in this case would "prematurely" reveal anything. They would, instead, disclose to Mr. Johnson potentially critical records to which he should have obtained access in 2018 under the court's order that he be provided with all of the investigative files in this case.

80.     There is no evidence to suggest that disclosure of the investigative files would lead to the creation of "fraudulent alibis" or would lead Mr. Johnson or his lawyers to "destroy or alter evidence."  Mr. Johnson already has a solid alibi for the time and date of the murder of Deputy Hardy, as confirmed by the very District Attorney's Office that prosecuted him originally and is now seeking a new trial: "In 2008, multiple alibi witnesses submitted sworn, uncontested affidavits that they saw Johnson across town from the crime scene the night of Deputy Hardy's murder."  Exhibit A.  And, as sworn to above, there have never been any allegations of witness or evidence tampering in this case – despite the fact that for almost 30 years, Mr. Johnson and his lawyers have been well aware of the identities of hundreds of potential witnesses in this case.

81.     The Seidel Declaration also lists four additional "potential harms" that might result from the disclosure of the records at issue.  Seidel Decl. ¶ 40.  Specifically, Seidel alleges the following potential harms, to which I respond as follows:

82.     "The identification of individuals and witnesses who possess information related to the investigation and possible harm to, or intimidation of, such witnesses."  Mr. Johnson and

his lawyers are already in possession of detailed, unredacted FBI records in this case that name both witnesses and FBI agents involved in this investigation.  There is no evidence to suggest that the disclosure of further similar records will in any way jeopardize or intimidate any named witnesses.  Moreover, the State has already been ordered to turn over its entire, unredacted investigative file in this case, which included FBI records in the possession of state law enforcement.  Any FBI records not previously disclosed were only withheld because they were apparently never shared with the state and county officials actually prosecuting the case against Mr. Johnson.

83.    "The use of released information to counteract evidence developed by investigators, to alter or destroy evidence, or create false evidence."  As already addressed above, there is no evidence that this is a concern, and the FBI is not even involved in the ongoing or future prosecution of this case.

84.    "The use of information released to [uncover] the government's prosecution and [trial] strategies."  This appears to be boilerplate language related to a potential *federal* prosecution.  Again, the Seidel Declaration is premised on an inaccurate premise, which is that Mr. Johnson was prosecuted in United States District Court.  Seidel Decl. ¶ 33.  The prosecutor who would retry Mr. Johnson *is supporting Mr. Johnson's request that his conviction and death sentence be vacated*.  The FBI has not—and cannot—produce any evidence or even allegation that the disclosure of this material would affect, in any way, an actual state court prosecution.

85.    "The use of released information by any subject of the investigation to assess the likelihood that he or she may be prosecuted and/or convicted in connection with this investigation."  The prosecutions for Deputy Hardy's murder have already occurred and

concluded more than 25 years ago.  The prosecution's multiple theories of who shot Deputy

Hardy have already been revealed, and Mr. Johnson has already been convicted.

86.    The Seidel Declaration also claims that release of the withheld documents "could

allow other third parties to interfere with pending proceedings . . . because once a release is made

to a plaintiff under the FOIA, the plaintiff's use and dissemination of the information to third

parties is unrestricted."  Seidel Decl. ¶ 41.  Again, Mr. Johnson's counsel is already in possession

of thousands of pages of unredacted investigative records, including FBI records, identifying

hundreds of witnesses.  None of these records are subject to any kind of protective order, and

there have been no allegations of witness intimidation/harassment, or evidence tampering.

I declare under penalty of perjury that the foregoing is true and correct, and that

Exhibits A through E attached hereto are true and correct copies.

Executed on this 14th day of January, 2025.

Ty Alper
Clinical Professor of Law
Co-Director, Death Penalty Clinic
Co-Director, Clinical Program
U.C. Berkeley School of Law

Exhibit A

ELECTRONICALLY FILED
5/20/2024 3:34 PM
01-CC-1996-000386.61
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON  SMITH, CLERK

**IN THE CIRCUIT COURT, TENTH JUDICIAL CIRCUIT**
**JEFFERSON COUNTY, ALABAMA**
**CRIMINAL DIVISION**

| | |
|---|---|
| **STATE OF ALABAMA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )      **CASE NO.  CC1996-386.60** |
| | ) |
| **TOFORREST JOHNSON,** | ) |
| | ) |
| **Defendant.** | ) |

## JEFFERSON COUNTY DISTRICT ATTORNEY'S SUPPLEMENTAL AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER

**COMES NOW** The Office of the Jefferson County District Attorney, by District Attorney Danny Carr, respectfully submits this amicus brief in support of Toforest Johnson's Rule 32 petition and request that a new trial be granted. For the reason contained within this brief, it is the position of the District Attorney's Office ("the District Attorney") that Mr. Johnson's Rule 32 petition should be granted, and that a court of competent jurisdiction grant said request. The District Attorney takes no position regarding Mr. Johnson's guilt or innocence.

The District Attorney seeks to intervene as *amicus curiae* because of its duty to the Court and the people of Jefferson County. A prosecutor's duty is not merely to secure convictions, but to seek justice. *Stickler v. Greene*, 527 U.S. 263, 281 (1999). After reviewing the circumstances of Mr. Johnson's conviction, the District Attorney has determined that its duty to seek justice requires intervention in this case based on several factors.

### INTRODUCTION

On June 12, 2020, at the conclusion of an extensive investigation, the Office of the Jefferson County District Attorney ("the DA's Office") filed an amicus brief in the Circuit Court of Jefferson County summarizing its conclusion that Toforest Johnson's capital murder

conviction and death sentence must be vacated in the interest of justice. At the time, for the reasons detailed in this report, the DA's Office concluded that Johnson's conviction was fundamentally unreliable and that the duty to seek justice required intervention in this case.

The DA's Office launched its Conviction Review Unit (CRU) on January 1, 2021. In doing so, we established a formal protocol for reviewing past convictions, including a protocol for creating reports upon completion of the review of a case. Because the CRU was not established until after the DA's Office's review of Johnson's case, there was no official report produced at the time. However, the office is pleased to provide this concise summary of its investigation with detailed support for its conclusion that the conviction and death sentence of Toforest Johnson cannot stand.

This report is based on a review of the entire prosecution and law enforcement file in this matter; trial and post-conviction transcripts; pleadings filed by the State and the defense; interviews with trial prosecutors, defense and post-conviction counsel, and witnesses; recordings of witness interviews with investigators; and consultations with the victim's family.

A significant impetus for the DA's Office's thorough investigation of Johnson's case was the position of the original trial prosecutor, Jeff Wallace. Wallace served as the lead prosecutor in this case for four years and knew the case better than anyone else. He sought and obtained Johnson's conviction and death sentence over the course of two trials and many years. He now firmly believes, in light of information about which he was unaware at the time he prosecuted this case, that Johnson should receive a new trial. While Wallace's position alone is not dispositive, it did corroborate the necessity of this office conducting a thorough review.

**SUMMARY OF BASIS FOR CONCLUSION THAT NEW TRIAL IS
WARRANTED**

Jefferson County Deputy Sheriff William G. Hardy was shot and killed in the parking lot
of the Crown Sterling Suites hotel in Birmingham, Alabama on July 19, 1995. Deputy Hardy was
a dedicated and beloved 23-year veteran law enforcement officer.

Five men and one woman were arrested and charged in connection with the murder:
Omar Berry, Quintez Wilson, Leon Colvin, Latanya Henderson, Ardragus Ford, and Toforest
Johnson. The charges were eventually dropped against Berry, Wilson, Colvin, and Henderson.
Johnson and Ford were each tried separately for Deputy Hardy's murder, and the initial trials of
each man ended in a mistrial when the jury could not agree on guilt. At Johnson's second trial, in
1998, he was convicted of capital murder and sentenced to death. At Ford's second trial, in 1999,
he was acquitted and released.

Johnson has always maintained his innocence, stating that at the time of the shooting he
was at Tee's Place, a nightclub across town. At trial, there was no physical evidence or
eyewitness accounts tying him to the crime. Instead, the case centered on the testimony of one
witness, Violet Ellison, who claimed she overheard Johnson confess to the murder on a three-
way phone call on which she was eavesdropping. Nobody contests that Ellison is the key to
Johnson's conviction and the reason he is on death row today.

There were reasons to doubt Ellison's credibility from the beginning. For example, her
testimony conflicts with the physical evidence, and the notes she claimed to have taken
contemporaneously contained information she knew only from other sources. In fact, the grand
jury was presented with an account that contradicted Ellison's account, even after she came
forward. (The grand jury was told that Ford and Berry shot Deputy Hardy.) In the years since

Johnson's trial, additional evidence has undermined Ellison's credibility and the case against Johnson:

- In 1999, just after Johnson was convicted, the theory of the murder that was based on Ellison's testimony was abandoned in the trial of Ardragus Ford. At Johnson's trial, based on Ellison's testimony, it was argued that Johnson and a man named Quintez Wilson shot Deputy Hardy. At Ford's subsequent trial, the argument was that Ford pulled the trigger. The names Violet Ellison and Quintez Wilson were never mentioned. This was because at Ford's trial, Yolanda Chambers was the key witness, even though she had been called a "liar" at Johnson's trial and even though she had admitted telling "hundreds of lies" to the police about the case. (Chambers' original claim that Johnson was involved – which she later recanted – was the reason he was arrested in the first place.)

- In 2008, multiple alibi witnesses submitted sworn, uncontested affidavits that they saw Johnson across town from the crime scene the night of Deputy Hardy's murder.

- In 2014, lead prosecutor Jeff Wallace acknowledged in a court hearing that the State's case against Johnson was "not very strong because it depended on the testimony of Violet Ellison."

- In 2019, it was discovered that the State paid Ellison $5,000 for her testimony. This was just months after the circuit court was told that the State's files contained nothing about anyone applying for a reward or being granted a reward in the matter of the murder of Deputy Hardy. Months later (and 17 years after Johnson first alleged that Ellison had been paid), a check for $5000 surfaced. The

check dated August 18, 2001 was paid to Violet Ellison for her testimony against Johnson in this case.

- In 2020, lead prosecutor Wallace announced his support for a new trial for Johnson.

- In 2022, it was revealed that Ellison served as a key witness for the State in several other criminal cases, including one Jefferson County case, pending at the same time as the Johnson case, that resulted in an acquittal and another that was dismissed prior to trial.

The conclusion that Johnson's conviction is fundamentally unreliable is not based on any one fact. Instead, it is based on the totality of the facts. Johnson's conviction hinges on Ellison's account. And we know now that the physical evidence contradicts Ellison's account *and* that Ellison's notes contained information based on other sources *and* that credible alibi witnesses place Johnson elsewhere at the time of the crime *and* that Ellison was paid $5,000 for her testimony. We also know that Ellison was not believed by law enforcement initially *and* that a different theory of the case that contradicted her account was pursued after Johnson's trial *and* that the lead prosecutor now has such grave concerns about Ellison's account that he supports a new trial for Johnson.

When reviewed all together, the conviction and death sentence in this case cannot be justified or allowed to stand.

**CONCLUSION**

The role of the Conviction Review Unit is to assess convictions holistically. The evidence in this case has unraveled over 20 years. It has not been possible, until recently, to fully appreciate the full extent to which the foundation of this conviction has disintegrated. The jury

and judges who previously assessed this case did not have the benefit of all of the information that we have access to now.

The DA's Office's conclusions concerning the facts discussed in this report are not influenced by the opinions of the public or those involved in the case. The findings are based on a thorough review of the evidence in this case. A thorough review and investigation of the entire case leaves no confidence in the integrity of Johnson's conviction. The interest of justice demands that Johnson be granted a new trial.

/s/ *Danny Carr*
DANNY CARR
District Attorney
801 Richard Arrington Jr. Blvd. No.
Birmingham, AL 35203
(205) 325-5252

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that on May 20, 2024, the forgoing document was electronically filed with the Clerk using the Alafile system and served via email on the following counsel:

Jon Hayden, Esq.
jhayden@ago.state.al.us

Ty Alper, Esq.
talper@law.berkeley.edu

Exhibit B

ELECTRONICALLY FILED
6/12/2020 10:05 AM
01-CC-1996-000386.60
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON SMITH, CLERK

**IN THE CIRCUIT COURT, TENTH JUDICIAL CIRCUIT**
**JEFFERSON COUNTY, ALABAMA**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CC1996-386.60 |
| | ) | |
| TOFOREST O. JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## JEFFERSON COUNTY DISTRICT ATTORNEY'S *AMICUS CURIAE* BRIEF IN SUPPORT OF PETITIONER

The Office of the Jefferson County District Attorney, by District Attorney Danny Carr, respectfully submits this amicus brief in support of Toforest Johnson's Rule 32 petition and request that a new trial be granted. For the reason contained within this brief, it is the position of the District Attorney's Office ("the District Attorney") that Mr. Johnson's Rule 32 petition should be granted, and that a court of competent jurisdiction grant said request. The District Attorney takes no position regarding Mr. Johnson's guilt or innocence.

The District Attorney seeks to intervene as *amicus curiae* because of its duty to the Court and the people of Jefferson County. A prosecutor's duty is not merely to secure convictions, but to seek justice. *Stickler v. Greene*, 527 U.S. 263, 281 (1999). After reviewing the circumstances of Mr. Johnson's conviction and his subsequent Brady claim, the District Attorney has determined that its duty to seek justice requires intervention in this case based on a couple of factors.

1. There were several trials of different individuals relative to this case. Pursuant to these trials the state presented as many as five different theories relative to who shot Deputy Hardy.

2. The case originally was based on a young lady who admitted repeatedly lying to the police and prosecutors, as well under oath.

3. There are a number of alibi witnesses who did not testify at trial whom claim to have seen Mr. Johnson in another area of town at the time of the murder.

4. The main witness who testified to hearing the defendant admit killing Deputy Hardy over a telephone conversation was subsequently paid $5,000 which was never mentioned during trial.

5. The District Attorney prior to the filing of this brief, met with the Original Lead Prosecutor in this case. He expressed concerns about this case and supports this request as well.

**Conclusion**

It is the District Attorney's position that in the interest of justice, Mr. Johnson who has spent more than two decades on Death Row, be granted a new trial.

Respectfully submitted on this the 12th day of June 2020.

DANNY CARR
District Attorney
801 Richard Arrington Jr. Blvd. No.
Birmingham, AL 35203
(205) 325-5252

**CERTIFICATE OF SERVICE**

I do hereby certify that on May 29, 2020, the forgoing document was filed electronically with the Clerk using the Alafile system and served via email on the following counsel:

Jon Hayden, Esq.

jhayden@ago.state.al.us

DOCUMENT 326

Ty Alper, Esq.

talper@law.berkeley.edu

Exhibit C

ELECTRONICALLY FILED
7/2/2018 3:32 PM
01-CC-1996-000386.60
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**
**BIRMINGHAM DIVISION**

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| V. | ) Case No.:     CC-1996-000386.60 |
| | ) |
| JOHNSON TOFOREST ONESHA | ) |
| Defendant. | ) |

**Order Granting Petitioner's Motion for Discovery**

Upon consideration of Petitioner Toforest Johnson's Motion for Discovery dated June 13, 2018, the Court hereby **GRANTS** the motion.

The Court **ORDERS** the Office of the Jefferson County District Attorney to provide Mr. Johnson's counsel access to its complete file from this case.

The Court **ORDERS** the Office of the Jefferson County Sheriff to provide Mr. Johnson's counsel access to its complete file concerning the investigation into the murder of Deputy William Hardy.

The Court **ORDERS** the Birmingham Police Department to provide Mr. Johnson's counsel access to its complete file concerning the investigation into the murder of Deputy William Hardy.

The Court **ORDERS** Birmingham Police Department's Crimestoppers to provide any and all information relative to information provided by and payment received from Violet Ellison in this case.

The Court **ORDERS** the Jefferson County Circuit Court and Clerk's Office to provide Mr. Johnson's counsel access to all documents pertaining to the proceedings

about the reward money in this case, including but not limited to all documents relating to the Court's August 8, 2001 order approving a $5,000 reward payment to Violet Ellison.  This access is to include any payments and or information from the Governor's Office or State of Alabama Comptroller.

**DONE this 2nd day of July, 2018.**

/s/ **TERESA T. PULLIAM**
**CIRCUIT JUDGE**

# Exhibit D

```
 1            IN THE CIRCUIT COURT OF JEFFERSON COUNTY

 2                    TENTH JUDICIAL CIRCUIT

 3                      CRIMINAL DIVISION

 4                      STATE OF ALABAMA

 5

 6      STATE OF ALABAMA,            )

 7                                   )CASE NUMBER:

 8        vs.                        )CC-1996-386

 9                                   )

10    TOFOREST ONESHA JOHNSON,)

11         Defendant.               )

12

13              REPORTER'S OFFICIAL TRANSCRIPT

14                TAKEN OCTOBER 9, 2018

15

16  BEFORE:

17            Honorable Teresa Tanner Pulliam

18            Tenth Judicial Circuit Judge

19            Criminal Justice Center

20            Room 406

21            801 N. Richard Arrington Jr. Blvd.

22            Birmingham, Alabama  35203

23

24  COURT REPORTER:

25            Ashley N. Dickey, CCR, RPR
```

```
1                      A P P E A R A N C E S

2

3   FOR THE STATE:

4                 Mr. Jon B. Hayden

5                 Assistant Attorney General

6                 Office of the Attorney General

7                 501 Washington Avenue

8                 Post Office Box 300152

9                 Montgomery, Alabama  36130-0152

10

11  FOR THE DEFENDANT:

12                Mr. Ty Alper

13                Attorney at Law

14                University of California, Berkeley

15                School of Law

16                346 North Addition

17                Berkeley, California  94720-7200

18

19                Mr. Patrick Mulvaney

20                Attorney at Law

21                Southern Center For Human Rights

22                83 Poplar Street NW

23                Atlanta, Georgia 30303

24

25
```

1    minute.

2         MR. HAYDEN:  Yes, ma'am.

3         THE COURT:  Why wouldn't those field

4    notes be discoverable in the original case

5    under *Monk*?

6         MR. HAYDEN:  I think they are

7    specifically precluded under Rule 16.

8         THE COURT:  Well, traditionally here the

9    district attorney's office files open file.

10        MR. HAYDEN:  There was an entire box of

11   stuff labeled for Darryl Bender.  I don't

12   know.  I didn't look through that box, Your

13   Honor, since it was stuff that was provided.

14   I don't know if counsel has had a chance to

15   look at it either.  Those field notes may be

16   in there.

17        THE COURT:  They should be.  Do y'all

18   have a response?

19        MR. MULVANEY:  Judge, our response to

20   that would be if that's what we are talking

21   about, law enforcement's notes from

22   interviewing witnesses and so forth, our

23   understanding is that that wouldn't be

24   excluded under the work product doctrine.

25   Those would be discoverable.

1                    **CERTIFICATE**

2

3    STATE OF ALABAMA)

4    JEFFERSON COUNTY)

5

6         I, Ashley N. Dickey, CCR, RPR, Court

7    Reporter, Notary Public, State at Large, do

8    hereby certify that I recorded by means of

9    stenotype the foregoing proceedings at the time

10   and place stated in the caption hereof, that

11   the proceedings were transcribed by means of

12   computer-aided transcription, and the foregoing

13   represents a full, true, and correct transcript

14   of the proceedings on said occasion.

15

16        I further certify that I am neither of

17   counsel nor of kin to any parties of said

18   cause, nor am I in any manner interested in the

19   result thereof.

20

21                    _____

22                    Ashley N. Dickey, CCR, RPR

23                    Official Court Reporter

24   Alabama CCR No. 109

25   License Expires:  9-30-2019

Exhibit E

(03/31/95)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** PRIORITY                    **Date:** 10/05/1995

**To:** FBIHQ            **Attn:** International Relations
    Legat Madrid            and Operations Support
                        Branch, Room 7458

**From:** Birmingham
    Squad 3, VC/FTF
        **Contact:** SA Jeffrey C. Newton

**Approved By:** Evans Frank C

**Drafted By:** Newton Jeffrey C

**File Number(s):** 184A-BH-44128   (Pending)

**Title:** TOFOREST ONESHA JOHNSON;
    OMAR RAHMAN BERRY;
    QUINTEZ WILSON, aka
    Quintez Lamont Wilson,
    Steve Smith,
    "Fella";
    ARDRAGUS FORD, aka
    "Drag";
    WILLIAM G. HARDY (DECEASED) - VICTIM;
    JEFFERSON COUNTY, ALABAMA SHERIFF'S DEPARTMENT;
    POLICE KILLING;
    OO: BH

### ARMED AND DANGEROUS

**Synopsis:** Request for Legat Madrid to conduct interview of
MICHAEL ANTONIO ANSLEY.

**Reference:** Re Birmingham teletype to FBIHQ, 7/21/95.

**Enclosures:** Enclosed for FBIHQ and Legat Madrid are two copies
each of an LHM setting forth the details of the above captioned
matter for dissemination to Spanish law enforcement authorities.

**Details:** For the information of FBIHQ and Legat Madrid, at
approximately 12:55 a.m. on the morning of 7/19/95, Jefferson
County, Alabama, Sheriff's Deputy WILLIAM G. HARDY was shot and
killed by an unknown assailant outside a rear entrance of the

1

To: FBIHQ From: Birmingham
Re: 184A-BH-44128, 09/05/1995

Crown Sterling Suites Motel, 2300 Woodcrest Place, Birmingham,
Alabama.  Deputy HARDY was working a part time job as a security
guard for the motel when he was killed.

    Deputy HARDY was shot at least twice, once in the mouth
and once in right side of his forehead at close range.  Deputy
HARDY also suffered gunshot wounds to his left pinkie finger and
left palm area as a result of the first shot which struck him in
the mouth.

    Witness at the motel reported hearing a discussion
between at least two individuals in the parking lot area where
the shooting took place just prior to the shooting.  These
witnesses also reported hearing a considerable pause between the
two gunshots.  These reports are substantiated by investigation
conducted at the crime scene in which it was determined that
Deputy HARDY travelled approximately fifteen feet from the time
of the first gunshot to the mouth to the final near contact shot
that ended his life.

    Witnesses also reported that a lone male adult was seen
entering an automobile and driving away from the crime scene
seconds after hearing the gunshots.  The vehicle is described as
being a large, boxy shaped American make automobile, medium to
light in color, early to mid-eighties in age, similar to a
Chrysler New Yorker or Chevrolet Caprice in style.

    The Crown Sterling Suites Motel is known to be an
establishment frequented by major narcotics dealers from the
Birmingham area as well as others who travel to Birmingham.  One
of the individuals known to be at the motel that evening is
MICHAEL ANTONIO ANSLEY, a black male adult born ▓▓▓▓▓▓▓▓▓,
Social Security Account Number (SSAN) ▓▓▓▓▓▓▓.  ANSLEY is a
former University of Alabama student and former professional
basketball player for the Orlando Magic National Basketball
Association (NBA) Club.  ANSLEY is currently in Madrid, Spain,
where he is preparing to play professional basketball for a
Spanish team.  ANSLEY, his stepfather LEON COLVIN and his mother
ANNIE COLVIN, were present at the motel on the evening of the
shooting.  ANSLEY is a known associate of NATHANIEL JONES, a
narcotics dealer and federal fugitive who is the current subject
of 88A-BH-42795.  LEON COLVIN has been charged by the Jefferson
County Sheriff's Department (JCSD) with Hinderance of Prosecution
in this case, a felony in the State of Alabama.

    Investigation conducted by the JCSD concerning ANSLEY
has revealed that ANNIE and LEON COLVIN had been living at the

To: FBIHQ From: Birmingham
Re: 184A-BH-44128, 09/05/1995

Crown Sterling Suites Motel at ANSLEY's expense for approximately
fifty five (55) days prior to and including the night of the
shooting. At approximately 12:30 a.m. on the morning of the
shooting, ANSLEY left some money and a set of keys to a vehicle
at the motel front desk the evening of the shooting for his
mother to pick up. ANSLEY stated during his previous interview
that he had "grown tired" of driving his gold Lexus sedan that
evening and switched to driving his wife's red Lexus SC400 coupe.
ANSLEY was accompanied during this time by MONIKA NICOLE DANIELS,
a black female adult, who helped ANSLEY switch items between the
vehicles.  Prior to this, ANSLEY was observed at a nightclub in
Birmingham called TEE'S PLACE, where two of the subjects have
admitted to being prior to the time that the shooting took place.

Investigation by the JCSD has also revealed that ANSLEY
is the former fiance of CYNTHIA JORDAN, a black female adult by
whom ANSLEY has a minor son. JORDAN is the current girlfriend of
the subject QUINTEZ WILSON. ANSLEY's wife KIMBERLY ANSLEY, along
with ANSLEY's parents and other witnesses, advised law
enforcement authorities that WILSON has threatened to kill ANSLEY
for reasons unknown. ANSLEY denied that his life had been
threatened by WILSON when questioned about it during his previous
interview.

The JCSD has been able to determine that the above
captioned subjects went to the motel and waited in the rear
parking lot in order to conduct a narcotics transaction with
COLVIN and possibly with ANSLEY. Investigators believe that the
subjects WILSON, FORD, JOHNSON and BERRY intended to rob and/or
kill ANSLEY following the transaction. The JCSD also suspects
that ANSLEY has knowledge of the events that occurred in the
parking lot of the motel before, during, and after the shooting,
but has been reluctant to divulge this information for fear of
harming his professional basketball career. The JCSD believes
that ANSLEY is hindering prosecution by providing false and
misleading information concerning his activities prior to the
crime, as well as his knowledge of or involvement with people
charged with the death of Deputy HARDY.

Birmingham and the JCSD desire that contact be
established with the Security Officer of the Madrid, Spain
professional basketball team to assist in locating and
interviewing MICHAEL ANSLEY. Birmingham believes that
information in the team's possession concerning MICHAEL ANSLEY
will prove useful to Legat Madrid during their investigation.

3

To: FBIHQ From: Birmingham
Re: 184A-BH-44128, 09/05/1995

ANSLEY has previously been questioned by the Jefferson
County Sheriff's Department (JCSD) concerning his knowledge of
the shooting.  However, ANSLEY has provided investigators with
conflicting information concerning his activities prior to the
death of Deputy HARDY as well as with his involvement with
individuals charged with in the crime.  Birmingham is of the
opinion that an in-depth follow-up interview of ANSLEY concerning
the shooting may prove helpful to the ongoing investigation.  The
JCSD has requested that the FBI question ANSLEY concerning
specific topics as set forth below:

1)  With the exception of LEON COLVIN, do you know any
of the people charged in this crime?  If so, what is your
relationship with them?

2)  Did you go to the rear of the Crown Sterling Suites
Motel on the night of the shooting after changing vehicles?

3)  Did you see any of the defendants on the motel
property while you were there?  Have you ever seen them on the
motel property before?

4)  Have any threats been made to you directly or
indirectly by any of the defendants prior to or at any time since
the shooting?

5)  What time were you at the motel to change vehicles?

6)  Have you ever been involved with the use of illegal
narcotics?  Have you ever been involved in the sale and/or
purchase of illegal narcotics?

7)  Were you or anyone with you armed while you were at
the motel?

8)  Who was with you while you changed vehicles?

9)  Did anyone besides you and that person or persons
know you were in the motel parking lot to change vehicles?  How
did they know this?

10) What time did you arrive at Tee's Club?  What time
did you leave?  Whom were you with at Tee's Club?  With whom did
you leave?

11) Did you see any of the subjects at Tee's Club?

4

To: FBIHQ From: Birmingham
Re: 184A-BH-44128, 09/05/1995

12) What is the name of the person or persons for whom you rented a room at the Day's Inn prior to your changing of vehicles? How can they be contacted?

13) How long have you known MONIKA DANIELS? How long have you been dating her? Is she now in Spain with you? Has she been in Spain with you?

14) What is your association with a person known as LEON JOHNSON?

15) Why did you go to JOHNSON's house after you left the motel?

16) Did JOHNSON contact you or did you contact him?

17) How does JOHNSON contact you? Please provide any and all phone numbers, pager numbers, and addresses you have for JOHNSON.

18) Do you have a pager? If so, what is you pager number?

19) After leaving the Crown Sterling Suites motel, when is the next time you spoke to your mother ANNIE COLVIN or your stepfather LEON COLVIN? At what time did you speak with them? Who initiated the contact, and by what means of communication?

20) Did you speak with CYNTHIA JORDAN prior to going to change vehicles? If so, at what time did you speak with her?

21) When did you first learn that Deputy HARDY had been shot? Who told you? How did you find out this information?

22) Have you told anyone that you saw, heard, or otherwise possess any information or knowledge concerning this crime?

23) Have you been completely honest with the investigators so far? Are you being completely honest now?

24) Will you be available to answer further questions and continue to cooperate with law enforcement officials in this investigation, if necessary?

5

To: FBIHQ From: Birmingham
Re: 184A-BH-44128, 09/05/1995

25) Within days of the shooting, did you borrow money from anyone? If so, from whom did you borrow the money? What was the amount of the loan?

26) Do you have any knowledge of the crime, no matter how it was obtained, that may help in this investigation but that you were afraid to divulge during your earlier interview?

27) Can you provide to the investigators the names of anyone who may have information concerning the crime?

28) What accounts of the shooting incident have you heard?

**LEAD(S)**

Set Lead 1:

LEGAT MADRID

AT Madrid, Spain: Establish contact with the Security Officer of the Madrid Professional Basketball Club in an attempt to determine the residence address and telephone number of MICHAEL ANSLEY, a black male adult born ▇▇▇▇▇. Madrid is also to obtain any and all information concerning ANSLEY that may assist Birmingham and the Jefferson County Sheriff's Department (JCSD) in their ongoing investigation.

Set Lead 2:

LEGAT MADRID

at Madrid, Spain: Will locate and interview United States Citizen MICHAEL ANTONIO ANSLEY, a black male adult born ▇▇▇▇▇, concerning his knowledge of the above captioned matter. Legat Madrid is requested to base their interview of ANSLEY around the questions listed in the Details section of this communication in order that Birmingham may disseminate the results of the interview to the JCSD.

To: FBIHQ From: Birmingham
Re: 184A-BH-44128, 09/05/1995


### ARMED AND DANGEROUS

**CC:** Newton


◆◆

### WORK COPY ROUTING SHEET

**CC:** Newton

◆◆

7



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

1400-2121 Building
Birmingham, AL 35203

October 6, 1995

TOFOREST ONESHA JOHNSON;
OMAR RAHMAN BERRY;
QUINTEZ WILSON, also known as
Quintez Lamont Wilson,
Steve Smith,
"Fella";
ARDRAGUS FORD, also known as
"Drag";
WILLIAM G. HARDY (DECEASED) - VICTIM
JEFFERSON COUNTY, ALABAMA SHERIFF'S DEPARTMENT;
POLICE KILLING

At approximately 12:55 a.m. on the morning of July 19,
1995, Jefferson County, Alabama, Sheriff's Deputy WILLIAM G.
HARDY was shot and killed by an unknown assailant outside a rear
entrance of the Crown Sterling Suites Motel, 2300 Woodcrest
Place, Birmingham, Alabama. Deputy HARDY was working a part time
job as a security guard for the motel when he was killed.

Deputy HARDY was shot at least twice, once in the mouth
and once in right side of his forehead at close range. Deputy
HARDY also suffered gunshot wounds to his left pinkie finger and
left palm area as a result of the first shot which struck him in
the mouth.

Witness at the motel reported hearing a discussion
between at least two individuals in the parking lot area where
the shooting took place just prior to the shooting. These
witnesses also reported hearing a considerable pause between the
two gunshots. These reports are substantiated by investigation
conducted at the crime scene in which it was determined that
Deputy HARDY travelled approximately fifteen feet from the time
of the first gunshot to the mouth to the final near contact shot
that ended his life.

Witnesses also reported that a lone male adult was seen
entering an automobile and driving away from the crime scene
seconds after hearing the gunshots. The vehicle is described as
being a large, boxy shaped American make automobile, medium to

light in color, early to mid-eighties in age, similar to a
Chrysler New Yorker or Chevrolet Caprice in style.

The Crown Sterling Suites Motel is known to be an
establishment frequented by major narcotics dealers from the
Birmingham area as well as others who travel to Birmingham.  One
of the individuals known to be at the motel that evening is
MICHAEL ANTONIO ANSLEY, a black male adult born ██████████
Social Security Account Number (SSAN) ██████████.  ANSLEY is a
former University of Alabama student and former professional
basketball player for the Orlando Magic National Basketball
Association (NBA) Club.  ANSLEY is currently in Madrid, Spain,
where he is preparing to play professional basketball for a
Spanish team.  ANSLEY, his stepfather LEON COLVIN and his mother
ANNIE COLVIN, were present at the motel on the evening of the
shooting.  ANSLEY is a known associate of NATHANIEL JONES, a
narcotics dealer and federal fugitive who is the current subject
of 88A-BH-42795.  LEON COLVIN has been charged by the Jefferson
County Sheriff's Department with Hinderance of Prosecution in
this case, a felony in the State of Alabama.

Investigation conducted by the Jefferson County
Sheriff's Department concerning ANSLEY has revealed that ANNIE
and LEON COLVIN had been living at the Crown Sterling Suites
Motel at ANSLEY's expense for approximately fifty five (55) days
prior to and including the night of the shooting.  At
approximately 12:30 a.m. on the morning of the shooting, ANSLEY
left some money and a set of keys to a vehicle at the motel front
desk the evening of the shooting for his mother to pick up.
ANSLEY stated during his previous interview that he had "grown
tired" of driving his gold Lexus sedan that evening and switched
to driving his wife's red Lexus SC400 coupe.  ANSLEY was
accompanied during this time by MONIKA NICOLE DANIELS, a black
female adult, who helped ANSLEY switch items between the
vehicles.  Prior to this, ANSLEY was observed at a nightclub in
Birmingham called TEE'S PLACE, where two of the subjects have
admitted to being prior to the time that the shooting took place.

Investigation has also revealed that ANSLEY is the
former fiance of CYNTHIA JORDAN, a black female adult by whom
ANSLEY has a minor son.  JORDAN is the current girlfriend of the
subject QUINTEZ WILSON.  ANSLEY's wife KIMBERLY ANSLEY, along
with ANSLEY's parents and other witnesses, advised law
enforcement authorities that WILSON has threatned to kill ANSLEY
for reasons unknown.  ANSLEY denied that his life had been
threatned by WILSON when questioned about it during his previous
interview.

The Jefferson County Sheriff's Department has been able
to determine that the above captioned subjects went to the motel
and waited in the rear parking lot in order to conduct a
narcotics transaction with COLVIN and possibly with ANSLEY.

2

Investigators believe that the subjects WILSON, FORD, JOHNSON and BERRY intended to rob and/or kill ANSLEY following the transaction.  The investigators also suspect that ANSLEY has knowledge of the events that occured in the parking lot of the motel before, during, and after the shooting, but has been reluctant to divulge this information for fear of harming his professional basketball career.  The Jefferson County Sheriff's Department believes that ANSLEY is hindering prosecution by providing false and misleading information concering his activities prior to the crime, as well as his knowledge of or involvement with people charged with the death of Deputy HARDY.

ANSLEY has previously been questioned by the Jefferson County Sheriff's Department concerning his knowledge of the shooting.  However, ANSLEY has provided investigators with conflicting information concering his activities prior to the death of Deputy HARDY as well as with his involvement with individuals charged with in the crime.  The Federal Bureau of Investigation as well as the Jefferson County Sheriff's Department is of the opinion that an in-depth follow-up interview of ANSLEY concering the shooting may prove helpful to the ongoing investigation.  The Jefferson County Sheriff's Department has requested that the Federal Bureau of Investigation question ANSLEY concerning his knowledge of the events surrounding the tragic death of Deputy HARDY.

3

FD-302 (Rev. 3-10-82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription        1/23/95

On January 20, 1996, MICHAEL ANTONIO ANSLEY, date and place of birth ▇▇▇▇▇, Birmingham, Alabama, Social Security Number ▇▇▇▇▇, was interviewed by H. ENRIQUE GHIMENTI, Legal Attache Madrid, at his residence located at Arquiteco Alonso Carbonel 18, Malaga, Spain. ANSLEY had been previously contacted at the Pabellon De Ciudad Jardin, Malaga, Spain, and advised of Legat GHIMENTI's interest in talking to him at the American Embassy, Madrid or the American Consulate in Fuengirola, Malaga, in relation to the killing on July 19, 1995, of Sheriff WILLIAM G. HARDY at the Crown Sterling Suites Motel, 300 Woodcrest Place, Birmingham, Alabama.

ANSLEY indicated that he had previously provided testimony to the Sheriff's Department at Jefferson County, Alabama, and he did not understand why further questioning concerning this matter was necessary. ANSLEY stated he did not have any information or knowledge concerning this incident and all information and questions asked of him had been answered previously. Legat GHIMENTI explained the need to proceed with the interview unless ANSLEY had any objections. ANSLEY indicated that he was willing to respond to any and all questions.

The following reflects the questions asked of ANSLEY and the responses provided during the interview. Present during the interview were Inspector JOSE A. BARBERO ARENA and Police Officer OLGA CRISTINA LEAL CASAL. Neither of these officers participated in the interview inasmuch as they do not speak English and the interview was conducted in English.

Q. With the exception of LEON COLVIN, do you know any of the people charged in this crime? If so, what is your relationship with them?

A. ANSLEY indicated he does not know any of the people implicated in the murder. He emphasized that he does not know anyone. He was asked whether he knew QUINTEZ WILSON and he responded that he does not know him even though he has been

| Investigation on | 1/20/96 | at | Malaga, Spain | 184A-BH-44128 - 67 |
| File # | | | | |

by   LEGAT ENRIQUE GHIMENTI/phs          Date dictated   1/23/96

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of __MICHAEL ANTONIO ANSLEY_____, On ___1/20/96___, Page ___2___

      informed WILSON is going out with CYNTHIA JORDAN, with whom
ANSLEY had a son.  ANSLEY stated that he has never had any
contact with subject WILSON.  ANSLEY further indicated that he
did not know the four subjects of this investigation: TOFOREST
ONESHA JOHNSON, OMAR RAHMAN BERRY, QUINTEZ WILSON and
ARDRAGUS FORD.

         Q.  Did you go to the rear of the Crown Sterling Suites
Motel on the night of the shooting after changing vehicles?

         A.  ANSLEY responded he had been at the motel that
night.  He had come over to change automobiles.  He indicated
that he came over to pick up a red Lexus which his mother had and
had left in the parking lot the gold Lexus he was driving.
ANSLEY indicated that he went to the side of the motel to change
cars and not to the rear of the Crown Sterling Motel.  After
taking the second car, ANSLEY indicated he drove around the
motel, came to the front and proceeded to give the clerk at the
motel the keys for the gold lexus and a $5.00 tip.

         Q.  Did you see any of the defendants on the motel
property while you were there?  Have you ever seen them on the
motel property before?

         A.  ANSLEY indicated that he did not see any of the
people involved or accused of this murder.  ANSLEY further stated
that he has never seen them in his life and he does not know
them.

         Q.  Have any threats been made to you directly or
indirectly by any of the defendants prior to or at any time since
the shooting?

         A.  ANSLEY advised that he has not received any threats
directly nor has he been informed that there are any threats
against him.  He wavered in this question and indicated that he
does not pay attention to his mother.  ANSLEY did not want to
elaborate further on this answer.

         Q.  What time were you at the motel to change vehicles?

         A.  ANSLEY responded that he did not remember the exact
time he was at the motel.  However, he had left the TEE'S PLACE
past 11:00 P.M. and from there he had gone to the Crown Sterling

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of    **MICHAEL ANTONIO ANSLEY**    , On    1/20/96    , Page    3

        Suites Motel.  Upon further questioning, ANSLEY reiterated that
he did not remember the exact time he had been at the motel and
he continued providing the same answer.

        Q.  Have you ever been involved with the use of illegal
narcotics?  Have you ever been involved in the sale and/or
purchase of illegal narcotics?

        A.  ANSLEY indicated that he has not been involved in
the use of drugs, the sale or purchase of drugs nor has he ever
been in trouble with the law, except for a speeding ticket.
ANSLEY once again indicated that he does not know the subjects of
this investigation.

        Q.  Were you or anyone with you armed while you were at
the motel?

        A.  ANSLEY stated that he does not own or have ever had
a gun with him.  He further stated that he was with MONIKA NICOLE
DANIELS and, as far as he knows, she did not have any weapons
with her.  ANSLEY indicated that MONIKA comes to visit him in
Spain but she does not live with him.  He further stated that she
is currently visiting him and staying with him at his residence.

        Q.  Who was with you while you changed vehicles?

        A.  ANSLEY responded that MONIKA NICOLE DANIELS was the
only person with him when he went to exchange cars.  She helped
him exchange a CD player and some CD's from one vehicle to the
other.  ANSLEY stated that MONIKA NICOLE DANIELS was with him the
whole time he had been at the motel.

        Q.  Did anyone besides you and that person or persons
know you were in the motel parking lot to change vehicles?  How
did they know this?

        A.  ANSLEY stated that no one else other than MONIKA
knew that he was going to the motel.  He stated that it had been
a spur of the moment decision.  Once again, ANSLEY stated that he
did not know "these guys" referring to the subjects of this
investigation.

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of    MICHAEL ANTONIO ANSLEY                    , On    1/20/96    , Page    4

      Q.  What time did you arrive at Tee's Club?  What time
did you leave?  Whom were you with at Tee's Club?  With whom did
you leave?

      A.  ANSLEY stated that he does not remember at what
time he arrived at Tee's Club; however, he was at Tee's Club for
about three to three and a half hours.  ANSLEY stated that he had
left about 11:30 to 11:45 P.M. and had been at the club initially
with his friend, ERICK HARRIS.  Both went together to the club.
ANSLEY stated that he does not know  ERICK's address and that he
only sees him in the summertime when he visits Birmingham.
ANSLEY stated that he goes with ERICK to "shoot ball" and knows
him since both were at Jackson Olin High School.  ANSLEY stated
that he had made arrangemets with MONIKA DANIELS to meet her at
Tee's Club and that she had arrived after he had been in the club
for a while.

      ANSLEY indicated he had left with MONIKA and ERICK
stayed behind.  ANSLEY stated that he had seen a number of other
people at the club whom he knows; however, he had not been with
them.  He did not elaborate further on this answer, even though
he was requested to provide the names of other people who were at
the club and he knew.

      Q.  Did you see any of the subjects at Tee's Club?

      A.  ANSLEY responded in an exasperated tone that he had
previously stated that he did not know "these guys"; he stated
that he does not know them nor does he know what they look like.

      Q.  What is the name of person or persons for whom you
rented a room at the Days Inn prior to your changing of vehicles?
How can they be contacted?

      A.  ANSLEY responded that their names are QUINTIN
PARLSON (phonetic) and TANYA DAVIS.  ANSLEY indicated he had
rented a room at the Days Inn for them since he was staying at
that same motel.  ANSLEY stated upon further questioning, that
they also had been at Tee's Club with him and had left together
with him.  ANSLEY advised that they had been at the same
nightclub and had followed him to the Days Inn.  ANSLEY indicated
he had rented the motel room for them in his name since they
could not rent it because they were Birmingham residents.  ANSLEY
had stated that he had documentation which indicated that he was

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of   **MICHAEL ANTONIO ANSLEY** _____ , On ___1/20/96___ , Page ___5___

from out of state and therefore he was allowed to rent
accommodations at the Days Inn. ANSLEY advised that after the
room had been rented, the four of them went into his room at the
motel and they talked for a while. PARLSON and DAVIS left for
their room and it was at this time that ANSLEY and MONIKA decided
to go to the Crown Sterling Suites Motel to exchange vehicles.
He stated that he had decided to do so because it was the only
way to get the other car from his mother. ANSLEY stated his
mother was an early riser and unless he exchanged the cars when
she was asleep, he would not be able to find her at the motel the
following day. ANSLEY stated that he does not know where QUINTIN
PARLSON and TANYA DAVIS live.

          Q.   How long have you known MONIKA DANIELS?  How long
have you been dating her?  Is she now in Spain with you?  Has she
been in Spain with you?

          A.   ANSLEY indicated that he has known MONIKA DANIELS
for about six months.  He stated that he does not remember where
he met her.  He followed the previous response by indicating
that he was driving one day, saw MONIKA driving another car,
blinked his lights and talked to her in a gas station in
Birmingham.  ANSLEY indicated that's the way he made her
acquaintance in Birmingham, Alabama, and they have been friends
ever since.  ANSLEY further stated that she is a friend and is
currently visiting him in Spain and will be with him for about
another week.

          Q.   What is your association with a person known as
LEON JOHNSON?

          A.   ANSLEY indicated that JOHNSON is his best friend
and that JOHNSON is currently residing in Birmingham, Alabama.

          Q.   Why did you go to JOHNSON's house after you left
the motel?

          A.   ANSLEY stated that he had a cellular telephone
while he was in Birmingham.  After exchanging vehicles and
leaving the motel, he had called JOHNSON at his residence.  He
was asked by JOHNSON to get some cigarettes and beer and bring
them to his residence.  ANSLEY indicated that after purchasing
the cigarettes and beer, he went to JOHNSON's residence, stayed
with him for about ten minutes, cracked a few jokes and then he

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of   **MICHAEL ANTONIO ANSLEY**                          , On   1/20/96   , Page   6

left for the Days Inn Motel.  ANSLEY stated that he had not
mentioned anything else to JOHNSON nor could he have discussed
the incident at the Crown Sterling Suites Motel since he did not
know anything about it.

        Q.  Did JOHNSON contact you or did you contact him?

        A.  ANSLEY stated that he had contacted JOHNSON and not
the reverse since JOHNSON does not have a long distance account
which would be required to contact ANSLEY through his cellular
telephone.   ANSLEY clarified that the cellular telephone he had
with him at that time was from Orlando, Florida, and in order to
contact that number, JOHNSON would have had to dial the area code
(407) which corresponds to the area of Orlando, Florida.

        Q.  How does JOHNSON contact you?  Please provide any
and all phone numbers, page numbers and addresses you have for
JOHNSON.

        A.  ANSLEY stated that JOHNSON's telephone number is
(205) 798-4018.  ANSLEY indicated that he does not know whether
JOHNSON has a pager nor does he know his address.  He stated that
he knows where JOHNSON lives but he does not have nor does he
remember JOHNSON's address.  ANSLEY indicated that when he needs
to talk to JOHNSON, he goes to a public telephone and calls
JOHNSON, which he does on a daily basis.

        Q.  Do you have a pager?  If so, what is your pager
number?

        A.  ANSLEY indicated that he owned a pager about six
years ago in Birmingham.  However, he has not had a pager since
then.  ANSLEY stated that he does not have a pager at the moment
nor had he one in July 1995.  ANSLEY stated that he does not own
a telephone or a cellular telephone at this moment and all his
telephone communications are made through public telephones or
through his Manager, JACINTO CASTILLO.  ANSLEY advised that
CASTILLO is his manager in Spain and anyone who wants to get in
touch with ANSLEY has been provided the telephone number for
Unicaja, which is 223-5708.

        Q.  After leaving the Crown Sterling Suites Motel, when
is the next time you spoke to your mother, ANNIE COLVIN, or your

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of __MICHAEL ANTONIO ANSLEY_____, On __1/20/96__, Page __7__

step-father, LEON COLVIN?  At what time did you speak with them?
Who initiated the contact and by what means of communication?

        A.  ANSLEY indicated that they had come into the Days
Inn the following morning after he had exchanged automobiles.
They had a normal conversation and does not recall having
discussed or mentioned anything relating to the assassination
that took place at the motel.  ANSLEY stated that he had given
his mother some money.  ANSLEY clarified that the next time he
had seen his step-father was the same night he had exchanged
vehicles.  ANSLEY indicated that after he had exchanged the
vehicles and returned to the Days Inn, two male sheriffs had come
to the room and asked him to come down to the sheriff's
department.  He was driven by the sheriffs to the sheriff's
department and upon entering, he had seen his step-father coming
out from one of the offices accompanied by a sheriff.  ANSLEY
stated that when the two sheriffs came to the Days Inn Motel, he
had been told that they needed to ask him some questions and he
had to come down to the sheriff's office.  He stated that he had
not been informed at that time, of the reasons they needed to
talk to him.  However, upon entering the sheriff's department and
seeing his step-father, he had imagined that he had been involved
in some accident and that was the reason he had been asked to
come to the sheriff's department.  ANSLEY stated that as of that
time, he still did not know a sheriff had been killed.

        After entering the sheriff's office he was taken into
an interrogation room and was questioned by two officers.  He was
asked about his whereabouts and he provided all the answers to
the questions posed by the police officers.

        ANSLEY indicated that during the interrogation he
learned that a sheriff had been killed at the Crown Sterling
Suites Motel and that was the first time he learned of this
incident.

        He further stated that after his interrogation, the
police department seized his automobile and proceeded to search
it and fingerprint it.  ANSLEY stated that during the search they
had found a marijuana butt; however, it was not his since his
mother had had possession of that car previous to his picking it
up.  ANSLEY further indicated that MONIKA had also been
interviewed in a separate interview room and that after the

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of  **MICHAEL ANTONIO ANSLEY**                    , On    1/20/96    , Page    8

interviews were over, they had been taken back to the Days Inn Motel by a police officer.

Going over his previous statement that his parents had showed up that following morning, ANSLEY reiterated that he had not talked with them about the assassination at the motel nor had they discussed their interrogation by the police officers at the sheriff's department.  He indicated that he had not discussed this matter with his step-father and mother since he does not like his step-father nor does he enjoy talking to him.  ANSLEY stated that he does not feel his step-father is helping his mother.  ANSLEY, in response to questioning, indicated that he did not know anything about his step-father's past nor does he know whether he has been in trouble with the law.

Q.  Did you speak with CYNTHIA JORDAN prior to going to change vehicles?  If so, at what time did you speak with her?

A.  ANSLEY responded that he does not remember having talked to her.  He stated that he only talks to her when he goes to see his son and gives her money for the support of his son. He indicated that he does not have any relationship with her other than the relationship that two people that have a common offspring would have.

Q.  When did you first learn that Deputy HARDY had been shot?  Who told you?  How did you find out this information?

A.  ANSLEY reiterated the same response previously provided that he had learned when he was being interviewed by the police officers at the sheriff's department.  ANSLEY indicated that one of the detectives at the sheriff's department, he did not remember the name, had mentioned the fact that a sheriff had been shot at the motel the night he was being interviewed. ANSLEY said that the name of the police officer or sheriff who informed him of the killing of the sheriff was TONY.

Q.  Have you told anyone that you saw, heard, or otherwise possess any information or knowledge concerning this crime?

A.  ANSLEY stated that no he had not said anything to anyone since he did not know anything.  He stated that he has not discussed this matter with anyone.

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of ___MICHAEL ANTONIO ANSLEY_____ , On ___1/20/96___ , Page ___9___

      Q. Have you been completely honest with investigators so far? Are you being completely honest now?

      A. ANSLEY stated that he had been honest with everyone who had talked to him about this matter. He indicated that he could not provide any information concerning the assassination since he does not know anything nor does he know any of the subjects under investigation. He further stated that he does not know why the sheriff was killed and that the only reason he had been to the motel was to exchange his car. ANSLEY stated that he was willing to take a lie detector test if administered in Spain. He indicated that he will not travel to the United States to take this test at this moment because of his job commitments in Spain with his basketball team. Therefore he cannot travel or do anything that would harm the basketball competition or championship of this team. ANSLEY stated that after the season is over, he would be willing to travel to the United States in order to take the lie detector test. ANSLEY stated that he does not know if his step-father knows any of the subjects under investigation, but if he does, "that's a shame."

      Q. Will you be available to answer further questions and continue to cooperate with law enforcement officials in this investigation if necessary?

      A. ANSLEY stated that he is ready to cooperate at any time as he has done until now and once again indicated that he is willing and ready to take a lie detector test?

      Q. Within days of the shooting, did you borrow money from anyone? If so, from whom did you borrow the money? What was the amount of the loan?

      A. ANSLEY indicated that he does not recall having asked anyone for money. He stated that two weeks prior to this incident (killing), he had asked CYNTHIA JORDAN for $200.00 dollars and that she had loaned him the money. However, this loan had been made prior to the incident and not after.

      Q. Do you have any knowledge of the crime, no matter how it was obtained, that may help in this investigation but that you were afraid to divulge during your earlier interview?

FD-302a (Rev. 11-15-83)

184A-BH-44128

Continuation of FD-302 of  **MICHAEL ANTONIO ANSLEY**                              , On    1/20/96    , Page    10

      A.  ANSLEY stated in an exasperated tone that he did not have any information nor does he know anything; therefore he has been truthful and cannot provide any additional information.

      Q.  Can you provide to the investigators the names of anyone who may have information concerning the crime?

      A.  ANSLEY restated that he did not know anything about the shooting or the people involved in this assassination.  He reiterated that he went to the Crown Sterling Suites Motel to exchange cars and that he had gone at that time since it was the only time he could get his other car.  He indicated his mother gets up early in the morning and the only way of getting possession of the car was to wait until night when she was asleep.

      Q.  What accounts of the shooting incident have you heard?

      A.  ANSLEY stated that the only thing he knows is what LEON had told him, that a girl had identified his step-father and the people that were there.  ANSLEY, upon further questioning indicated that LEON had not gone into further detail and that he was not interested in asking any questions.  ANSLEY stated he had contacted LEON and it was during one of these telephone conversations that LEON had mentioned the testimony of the girl. ANSLEY stated once again that he does not know anything concerning this assassination.

Exhibit F

**THE BIRMINGHAM NEWS**

## METRO/STATE

THURSDAY, AUGUST 10, 1995

---

rnor
nistic
t state's
budgets

'hite
writer

MERY — Gov. Fob
ednesday said the state
recently signed into law
d proration, since law-
ased to approve spending
than forecasters expect
ollect.
economy holds up, we
e a deficit," James said.
uld have to order prora-
ross-the-board spending

RE

ys out-of-state tuition
ld not be abused.

threat of a deficit loomed,
te Constitution bans defi-

es doesn't expect any
'The budgets are taken
said.
makers approved spend-
\$11 billion in the two state
r fiscal year 1995-96,
5 Oct. 1.
line for the governor to
s approved in the current
session is midnight to-

the budgets. James on
so signed a bill to let the
w \$215 million for educa-
ling bonds, and a bill to
iomed-stadium board for
m.
year's .\$5.8 billion educa-
: will include \$3.33 million
Special Education Trust
argest source of state tax
education.
get next year will give an
million, a 2.2 percent in-
m the Trust Fund to the
Program, which provides
the classroom-instruction
kindergarten through 12th

will cut Trust Fund spend-

ing for two-year colleges and univer-
sities next year by about \$70 million.
or 7.5 percent.

■ Next year's operating budget
will let state agencies spend \$5.1 bil-
lion, about the same as this year.

Agencies that oversee public
health and youthful offenders will
get at least 15 percent more money
from the General Fund next year, as
will the attorney general, state trea-
surer and Ethics Commission.

State agencies that oversee prisons
and Medicaid will see smaller in-
creases. Money from the General
Fund will drop 8 percent or more for
the forestry commission, Legis-
lature, finance department, military
department, human resources
department, Alabama Development
Office, veterans affairs and the gov-
ernor's office.

■ The \$215 million bond issue will
give \$179 per student to each public
school system to spend on fixing
buildings: a total of \$128.5 million.

The bond issue also will give \$15
million to the Department of Youth
Services, \$23 million to a public
school equipment fund, \$6.5 million
to replace burned schools, \$11 mil-
lion in discretionary projects, \$5 mil-
lion to alternative schools for stu-
dents with discipline problems and
\$2 million to the Institute for Deaf
and Blind.

It also will give \$23 million to two-
year colleges and universities, in-
cluding about \$5 million each to his-
torically black Alabama State and
Alabama A&M universities, to make
up for past neglect.

■ The five members of the domed-
stadium board will be able to plan,

acquire, own, build and operate a
domed stadium in Birmingham that
could cost \$250 million.

But they will not be able to collect
taxes to help pay for a domed sta-
dium, if one is ever built.

The new law also creates a sepa-
rate nine-person commission to issue
by February a feasibility report on
building a domed stadium in Bir-
mingham within Jefferson County.

James on Tuesday also signed into
law a bill to charge an additional 1
percent tax on hotel and motel room
fees in Jefferson County starting
Sept. 1. The tax is expected to raise
\$930,000 a year, which will go to the
Greater Birmingham Convention and
Visitors Bureau to promote Birming-
ham and Jefferson County "as a con-
vention, sports event and visitors'
destination."



Gov. Fob James, center, prepares to sign the state's new, tougher DUI law in the office of Lt. Gov. Don Siegelman, right. At left is state Sen. Wendell Mitchell, D-Luverne.

*AP PHOTO*

---

## Ansley questioned in deputy's slaying

**By Carol Robinson**
News staff writer

A former University of Alabama
basketball star has been questioned
in connection with the murder of a
Jefferson County sheriff's deputy.

Michael Ansley, who played for
Alabama in the mid-1980s, was at
the Crown Sterling Suites on July 19,
the night Deputy William Hardy was
shot to death, according to sheriff's
officials.

Ansley, 28, was at the hotel visit-
ing his stepfather, who was staying
there and was eventually charged
with hindering prosecution in connec-
tion with the case.

Ansley was questioned by authori-
ties that evening and brought into
headquarters a second time, said
Capt. Carl Johnson.

"We did question Michael Ansley
because we could prove he was at
the hotel at the time it happened,
like we questioned everybody that
was there," Johnson said.

Johnson said Ansley hasn't been
charged with any crime and authori-
ties aren't actively pursuing him as a
suspect.

"I hate to use that cliche but ev-
erybody's a suspect," Johnson said.

Ansley's stepfather, Leonard Col-
vin, was charged with hindering
prosecution in connection with the
case. Colvin and his wife were stay-

ing at the hotel when Hardy was
slain.

Authorities said Colvin was ar-
rested because they believe he has
information about the murder that he
is not telling authorities. His attor-
ney, Edward May, refused to com-
ment.

Those charged with capital mur-
der in Hardy's death are Toforest
Onesha Johnson, 22, of Pratt City;
Quintez "Fella" Wilson, 20, of Sixth
Place, Pratt City; Ardragus D.
"Drag" Ford, 21, of Terrace R.; and
Omar Rahman Berry, 22, of Chenault
Street.

Chief Deputy Jim Woodward and
Johnson declined to elaborate on the
direction of the investigation.

"That would go toward motive, and
we're not discussing that right now,"
Johnson said.

Ansley graduated from Jackson-
Olin High School, where he was se-
lected as an all-state player his se-
nior year. He went on to play for Ala-
bama and was selected by league
coaches as a member of the All-
Southeastern Conference Freshman
team.

After finishing at Alabama, Ansley
had brief playing stints with the Or-
lando Magic and the Birmingham
Bandits before joining the European
Basketball League.

Authorities said Ansley is cur-
rently in Spain.

---

## James says he will kill bill restricting access to ballot

MONTGOMERY (AP) — Gov. Fob
James is blocking the Legislature's
attempt to make Alabama one of the
strictest states for third party and in-
dependent candidates to get on the
ballot.

James said Wednesday he will kill
a ballot-access bill by not signing it
by midnight tonight, the deadline for
the governor to act on bills approved
in the recent legislative session.

The Legislature passed a bill on its
last meeting day July 31 that would
have required a third party or inde-
pendent candidate to get signatures
on a petition equal to 3 percent of the
people who voted in the last gover-
nor's race. The current requirement
is 1 percent, or about 12,000 votes for

a statewide independent candidate.

"Three percent for a state race is
a little high; 3 percent for a legis-
lative race may be OK," James said.

The voting legislation, sponsored
by Rep. Jack Page, D-Gadsden, orig-
inally passed the Legislature with
the signature requirement at 5 per-
cent. But James suggested to the
Legislature on its final meeting day
that he could not accept 5 percent
and proposed the 3 percent level. The
Legislature accepted his proposed
amendment and passed the bill with
the 3 percent level.

James said that after further
study he couldn't support his own
suggestion.

---

## test astronaut to call Huntsville home acebound after sky diving 4,000 times

**By Robert Dunnavant**
News staff writer

HUNTSVILLE — NASA's newest astronaut
from Huntsville — and a sky diver — heads for
orbit next month with more "weightless" time un-
der his belt than most space rookies.

Fred W. Leslie, 44, a payload specialist aboard
space shuttle Columbia's 16-day mission in Sep-
tember, said Tuesday he figures he has spent at
least 50 hours of weightless time since 1970.

That's 4,000 jumps, by Leslie's count, with each
minute in freefall from a plane faithfully re-
corded and tabulated by the U.S. Parachute Asso-
ciation. He holds a world record as a participant
in a 200-person freefall formation in 1992.

His upcoming shuttle mission, where he ex-
pects his sky diving experience to come in handy,
is raising temptations to claim an additional 416
hours of "true freefall" in space, too.

"We log freefall time and, every now and then,
we pick up awards for the length of time in free-
fall," Leslie told reporters at Marshall Space
Flight Center. "I've been tempted to submit the
16 days ... but I suspect it would violate the spirit
of the rules ... so I probably won't."

He still plans to take his U.S. Parachute Associ-
ation T-shirt into space in his personal baggage,
however.

vering a golf ball-sized artificial world inside the
Spacelab laboratory. Leslie helped create the ex-
periment into planetary atmospheric flows a dec-
ade ago, while working as a research scientist at
Marshall, and waited on the ground as it flew on
the shuttle once before.

The "planet in a test tube" allows scientists like
Leslie to measure the way atmospheres might be-
have on other planets, the sun, or other stars. Dur-
ing its first flight, NASA recorded the perform-
ance of the experiment in controlled gravity with
cameras. This time Leslie will be able to interact
with the project in real time via computer, study-
ing atmospheric turbulence and other phenom-
ena.

"When NASA decided to fly the experiment
again, and go outside the astronaut corps for pay-
load specialists, I applied," Leslie said. He was
keyed his request and didn't even tell his father
until told in April 1994 that he would make the
flight.

"I called him and told him and he said, 'That's
good,' and we talked awhile and he hung up and
10 minutes later he called back ... and said,
'You're going to do what?' " Leslie said with a
laugh.

As a payload specialist, Leslie will also be
back-up for new experiments in protein crystal
growth designed by Larry Delucas of the Univer-
sity of Alabama in Birmingham, who flew the



---



**Ten Days Only**

*save* **20%** *entire*

*Queen Anne Shell*
*Collection*





Stephen Gates/Post-Herald

Gov. Fob James greets Bill Grayson after speaking to the Kiwanis and Rotary club meetings at the Herbert Center.

James said he is waiting for federal changes before calling a special session to deal with tort reform in Alabama.

person involved in a lawsuit to ask a judge to remove himself from a case if he had accepted a campaign contribution of $2,000 or more from another lawyer, complainant or defendant in the case.

They also propose constitutional amendments giving the Legislature impeachment powers over judges and adding nonlawyers to the Court of the Judiciary, which oversees the conduct of judges.

James praised the Legislature for passing most of the bills he proposed, including his education reform package.

He pledged to come back next year with plans to reform the state system of two-year and four-year colleges.

"Next session, two and four-year reform will be the order of the day. Our direction there will be qualitative and not quantitative. We're going to just have to go through a process of getting honest with ourselves on the higher education dollar," James said.

James joked that Alabama has five or six engineering schools,

making it superior to Georgia, which has only Georgia Tech. Such duplication of programs has been a source of criticism for Alabama universities.

The governor would offer no specifics of his higher education program, saying the administration has just started working on it.

## Despite questioning, Ansley not a suspect

By Stephanie Desmon
Post-Herald Reporter

Former University of Alabama basketball player Michael Ansley is among dozens of people who have been questioned in the killing of a Jefferson County Sheriff's deputy, but he is not a suspect.

Ansley spoke with investigators in the hours and days following Deputy William Hardy's July 19 slaying. They said they don't believe Ansley was at the scene at the time of the shooting and Jefferson County Chief Deputy James Woodward said yesterday he doesn't plan to bring the athlete in again.

But Ansley had been at the Crown

Sterling Suites in Birmingham, where Hardy worked off duty as a security guard, on the night of the shooting to see about a car, Woodward said.

He may have visited his stepfather, Leon Colvin, and his mother, who Woodward said had been guests at the hotel for more than 50 days.

Colvin, 41, was later charged with hindering prosecution in the Hardy case and was released on $10,000 bond.

Four others — 22-year-old Toforest Johnson, 21-year-old Ardragus Ford, 22-year-old Omar Berry and 20-year-old Quintez Wilson — are in the Jefferson County Jail charged with capital murder in Hardy's

death.

Ansley is listed in Jefferson County tax records as owner of a $93,730 home on Ridgeview Drive in Irondale, the same address listed as Colvin's on jail records.

Ansley is known for his short stints as a player for the National Basketball Association's Orlando Magic and the Continental Basketball Association's Birmingham Bandits. He currently plays ball for a European team.

Ansley could not be reached for comment yesterday. The lawyer who accompanied Ansley when he was questioned by county authorities refused to comment.

Please turn to ANSLEY, page D5



Mark Jordan/Post-Herald

...walk

...es Shades Creek in Mountain
...king on a trail alongside Mountain
...fternoon.

Birmingham Post-Herald, 8-10-95, p D1

10
1995



**History lands in Auburn**

A World War II fighter that will grace the television screen with Laurence Fishburne in 'The Tuskegee Airmen' kicked up dust as its 12-cylinder engine propelled it into Auburn's peaceful skies. Jimmy Leeward's P-51 Mustang lifted off Tuesday as it had done on World War II missions. Leeward, a 46-year-old Florida real estate developer, was visiting his son, Chad, a student at Auburn University. The P-51 is featured in a movie about America's first black combat pilots, who flew more than 700 missions during World War II without the loss of one bomber to enemy aircraft. The pilots trained at Tuskegee Institute, now Tuskegee University. The movie airs on HBO on Aug. 26.

by Amy Herzer
Post-Herald Reporter

A Sylvan Springs man, whose sexual abuse of his daughter was recently detailed in a book, apparently killed himself yesterday afternoon less than a week after he was charged with sexually abusing his 7-year-old granddaughter.

Colon Charles Hill, 52, was found dead in the back yard of his western-area home at 5:20 p.m. yesterday, said Sheriff's Lt. John Carden.

"He appeared to have died from a self-inflicted gunshot wound," Carden said.

Hill was charged Friday with first-degree sodomy and sexual abuse of his 7-year-old step-grand-daughter. He was out on a $40,000 bond.

Members of Hill's family could not be reached.

In 1975, Hill was convicted of raping his daughter, Melody Platt, since she was 3 years old.

Hill served about 10 years of a 35-year sentence, said Montgomery lawyer Jimmy Pool, who tried the case.

Ms. Platt wrote about that case at the hands of her father in a book published two years ago titled "Breaking the Silence — A Personal Story of Incest and Recovery."

# Death

### From page D1

Police are examining the camp's policy on transporting juveniles, he said.

"The camp is run by a private company," Tirey said. "When we transport our prisoners we handcuff and shackle them. That may be their policy, too."

The camp, one of four licensed by the state youth services agency, cares for about 20 boys at a time, said Anita Boswell, assistant administrator for community and regional services at DYS. The day-to-day operations, however, are contracted out to Children's Comprehensive Services in Nashville.

Ms. Boswell said the boy had just gotten out of the shower when he began "foaming or frothing at the mouth."

She said a physical performed the day he entered the boot camp showed no health problems.

The district attorney has subpoenaed the camp records and the medical center records, Tirey said. "Out of all that, we should be able to tell more about it."

The state youth services agency is also conducting an internal investigation.

Post-Herald reporter Jacinthia Jones contributed to this report

# Ansley

### From page D1

According to television news reports, Ansley's connection with the suspected players in the Hardy murder go beyond Colvin. Ansley and Wilson were apparently involved in a dispute about the Irondale home. Wilson had been living there with his girlfriend Cynthia Jordan, who had once been in a relationship with Ansley. Ansley asked Wilson and Ms. Jordan to move out and let his mother and stepfather move in, the reports stated. Wilson's attorney declined to comment yesterday.

Woodward said Colvin and Hardy



Hardy

had casually spoken in the time. Colvin was a hotel resident and Hardy a security guard.

Investigators have refused to divulge a motive in the case, but Woodward said a disagreement over Ansley's house is not at the center of it. Five suspects have been charged and will have a preliminary hearing before Judge R. O. Hughes next month. Woodward said the department is still investigating what happened the night of July 19.

# DEATHS

Vernon died a paraplegic Thursday, A. L. Thompson al Home, Inc. in Fayette. Survivors: sisters, Miss Mrs. Sarah stine Cribbs Hayden of ps of Louis-Howard Hay-and uncles. ule. Service

Church, native of Opelika, AL, and 1937 graduate of the University of Montevallo. She was a Primary teacher in the Birmingham School System for 32-years, and Jefferson County for 1 year. She was a member of Kappa Delta Epsilon, a national honorary for retired teachers organization and all local and state retired teachers organization. Funeral service will be Thursday, August 10, 1995, 3 p.m. at Johns Ridout's Southside with Rev. J. Jeffrey Nyberg officiating. Burial in Jefferson Memorial Gardens Cemetery, Trussville. Visitation will be from 1:30 until 3 p.m. She was preceded in death Jim Harper and Murry Davis. Survivors: children, Caroline and Jim Nyberg of Crystal River, FL, Louise Keith of Olney, MD., Annette Lovette of Birmingham, and Dan Davis of Lawrenceville, Ga.; sister, Polly Samford Jernigan of Opelika, AL; eight grandchildren; six great-grandchildren. Johns Ridout's Southside Funeral Home directing.

**GLOVER, MRS. RUTH G.** of Birmingham died Friday, August 4, 1995. She was a member of the Sixteenth Street Baptist Church. Funeral ser-

Mrs. Gertrude Roebuck of Roebuck, Mrs. Carolyn Harding of Birmingham, and Mrs. Edna Mae Smith of Trussville; son, Mr. Edwin V. (Bill) Harding of Mathews, AL; eight grandchildren; ten great-grandchildren. Jefferson Memorial Funeral Home directing.

**HARRIS, GEORGE SLAPPEY "SKIP", SR.** age 61, of Birmingham died August 8, 1995. He was president of Harris and Company, P.C., a Birmingham accounting firm, and had been a professional accountant throughout his career. Mr. Harris was musically gifted and was well-known for his abilities as a pianist, which he joyfully shared with others. He led the Skip Harris Trio for many years, a popular musical ensemble. In more recent years, Mr. Harris devoted his musical life to several area churches where he served in various directorships. A man of strong faith and liturgical insight, he was a spiritual beacon to all who knew him. Throughout his life, he was active in numerous Birmingham associations and charities. Survivors include, his wife, Mrs. Lillian "Becky" Harris, daughters and sons-in-law, Mrs. Leslie Harris

and Nell Jordan of Tarrant. Messmer Funeral Home directing.

**LACALLY, JACK WADE** age 42, of Knox Landing, Logan Martin Lake died August 7, 1995. He was a mechanic at Crown Nissan. Funeral service will be Friday, August 11, at 11:00 a.m. at Walker Chapel Funeral Home with burial in Walker Chapel Memory Gardens. Visitation will be Thursday, August 10, from 5:00 p.m. until 9 p.m. at the funeral home. Survivors: wife, Amanda LaCally; step-daughter, Julie Ann Williams of Hoover; sons, Gabe La-Cally and Jacob LaCally; step-son, Jim Williams, all of Hoover. Walker Chapel Funeral Home directing.

**LLOYD, JOHN S.** age 61, of Homosassa, FL, died Saturday, August 5, 1995. He was a retired pilot for Eastern Airlines, U.S. Marine Fighter Pilot, a Presbyterian, and a native of Birmingham. Survivors: wife, Jeanne R. Ruckman Lloyd; son, Alan Menold of Oceanside, Calif.; daughters, Susan Lloyd of Acworth, Ga., and Pam Clibrasi of Jonesboro, Ga.; five grandchildren. Gravesite service

ne, Inc.

AUG 10 1