**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TY ALPER, | |
| *Plaintiff*, | |
| v. | No. 24-cv-1837 (DLF) |
| DEPARTMENT OF JUSTICE, | |
| *Defendant*. | |

**<u>MEMORANDUM OPINION</u>**

Ty Alper challenges the Federal Bureau of Investigation's (FBI) withholding of various records under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Before the Court is Alper's Renewed Motion for Summary Judgment and Motion for Partial Reconsideration. Dkt. 26. For the reasons that follow, the Court will grant in part and deny in part his motion.

## I.    BACKGROUND

As a co-director of University of California, Berkeley Law's death penalty clinic, Alper represents Toforest Johnson, a man who was convicted of murdering a police officer in a hotel parking lot and sentenced to death in 1998 in Alabama. Alper Decl. ¶¶ 1–2, 31, Dkt. 15-3. Alper has represented Johnson since 2002, and Johnson currently has two pending petitions: one postconviction petition in state court as well as a federal habeas corpus petition in the U.S. District Court for the Northern District of Alabama. *Id.* ¶¶ 2, 48.

In February 2024, Alper submitted a FOIA request to the FBI seeking information on the FBI's involvement in Johnson's criminal case. *See* Def.'s Statement of Facts ¶ 1, Dkt. 12-2. The FBI identified approximately 513 potentially responsive pages and withheld them in their entirety pursuant to FOIA Exemption 7(A). *Id.* at ¶¶ 3–4. It also invoked FOIA Exemptions 5, 6, 7(C),

1

7(D), and 7(E).  *Id.* at ¶ 4.  The FBI moved for summary judgment, Dkt. 12, and Alper cross-moved for summary judgment, Dkt. 15.  The Court granted Alper's cross-motion for summary judgment as to documents withheld under Exemption 7(A) that had previously been disclosed to Johnson's legal team.  May 27, 2025 Order 1, Dkt. 21.  The Court denied both parties' motions without prejudice with respect to the withholdings under Exemptions 6, 7(C), 7(D), and 7(E).  *Id.* Finally, it granted the FBI's motion for documents withheld under Exemption 5.  *Id.*  Finding that Alper's "generalized claims" about the public interest in disclosure were insufficient, the Court invited Alper to file a supplemental declaration to support his arguments as to Exemptions 6 and 7(C).  Mem. Op. 9, Dkt. 22.

Following the Court's May 27, 2025 Order, the FBI disclosed 417 redacted documents. Alper 2d Suppl. Decl. ¶ 3, Dkt. 26-1.  The FBI withdrew its remaining Exemption 7(A) withholdings, Joint Status Report 1, Dkt. 23, and seemingly abandoned its withholdings under Exemption 7(D), *see* Alper 2d Suppl. Decl. ¶ 33; *see generally* Def.'s Opp'n, Dkt. 28; Decl. of Shannon R. Hammer (Hammer Decl.), Dkt. 28-1.

Alper now renews his motion for summary judgment as to documents withheld under Exemptions 6 and 7(C) and also moves for reconsideration of the Court's May 2025 Order under Fed. R. Civ. P. Rule 54(b) as to documents withheld under Exemption 5.  *See* Pl.'s Renewed Mot. 2–3, Dkt. 26.  With regard to Exemptions 6 and 7(C), Alper seeks the release of "unredacted versions of only a subset of the 417 documents."  Alper 2d Suppl. Decl. ¶ 4.  Specifically, Alper seeks the following redacted information: (1) "the names of FBI personnel who authored the memorandum concluding that the case against Johnson likely could not proceed" and the names of local "law enforcement officers whose investigation" is cited in support of that conclusion; (2) "the names of the third parties referred to in the documents related to Michael Ansley"; and

(3) "the names of the hotel guests referred to in the disclosed documents." *Id.* ¶ 7.  He also contends that the FBI has released documents that warrant reconsideration of the Court's Order granting summary judgment to the FBI as to withholdings under Exemption 5.  Pl.'s Renewed Mot. 11.  Finally, Alper argues that the FBI failed to release three documents since the Court's prior Order.  *Id.* at 16.

## II.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When a federal agency moves for summary judgment in a FOIA case, the Court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA.  *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).  When the FOIA requester is the moving party, summary judgment should be granted "when an agency seeks to protect material which, even on the agency's version of the facts falls outside the proffered exemption."  *Stein v. CIA*, 454 F. Supp. 3d 1, 16 (D.D.C. 2020) (citation modified); *see Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) ("When an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption, summary judgment in favor of the FOIA plaintiff is appropriate.").

Rule 54(b) "allows a litigant to move for reconsideration or modification of a district court's interlocutory order disposing of 'fewer than all the claims or the rights and liabilities of fewer than all the parties' 'at any time' before the court's entry of final judgment."  *Cobell v. Jewell*, 802 F.3d 12, 19 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 54(b)).  A district court may reconsider an interlocutory order "as justice requires."  *Capitol Sprinkler Inspection, Inc. v. Guest*

*Servs.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (citation modified).  "In general, a court will grant a motion for reconsideration of an interlocutory order only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order."  *Parker v. John Moriarty & Assocs.*, 221 F. Supp. 3d 1, 2 (D.D.C. 2016) (citation modified); *see Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) ("Justice may require revision when the Court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court." (citation modified)).  "[I]n order to promote finality and protect the court's judicial resources, the court is loath to revisit its prior decision absent extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice."  *Hall & Assocs. v. EPA*, 210 F. Supp. 3d 13, 18 (D.D.C. 2016) (citation modified).

### III.    Analysis

#### A.  Exemptions 6 and 7(C)

"FOIA Exemptions 6 and 7(C) seek to protect the privacy of individuals identified in certain agency records."  *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and Exemption 7(C) protects "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7).  When an agency invokes both exemptions, courts "focus" on Exemption 7(C) because it "establishes a lower bar for withholding material."  *Citizens for Resp. & Ethics in Wash. (CREW) v. DOJ*, 746 F.3d

4

1082, 1091 n.2 (D.C. Cir. 2014) (citation modified).  "To determine whether disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy for purposes of Exemption 7(C), [a court] must balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information."  *Roth v. DOJ*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (citation modified).

Alper seeks the following information that has been redacted by the FBI pursuant to Exemptions 6 and 7(C): (1) the names of FBI personnel who authored a December 1997 memorandum concluding that the case against Johnson likely could not proceed for lack of evidence and the names of the law enforcement officers whose investigation was cited in support of that conclusion; (2) the names of the third parties referred to in documents related to Michael Ansley, a witness at the hotel whom the FBI sought to interview; and (3) the names of the hotel guests who gave witness statements to the FBI.  *See* Alper 2d Suppl. Decl. ¶¶ 7, 21–23, 27, 31– 32, 34–36; Hammer Decl. ¶ 4.  Given the "substantial privacy interests" of both government agents and private citizens implicated here, *Roth*, 642 F.3d at 1174; *see* Mem. Op. 7, Alper has the burden to show "(1) that 'the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) that the information he seeks 'is likely to advance that interest,'" *Roth*, 642 F.3d at 1175 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).  The Court will evaluate each category of information in turn.

*FBI and Local Law Enforcement Personnel*.  The FBI redacts the names of its agents who authored the December 1997 memorandum.  Hammer Decl. ¶ 4.  As to their privacy interests, the FBI expresses concern that disclosing their names could expose agents to harassment or "endanger their safety and well-being."  *Id.* ¶ 6.

The Court agrees that FBI agents have substantial privacy interests, and courts in this Circuit routinely protect FBI special agents' names. *See e.g.*, *Concepcion v. FBI*, 606 F. Supp. 2d 14, 38–39 (D.D.C. 2009) ("Redaction of the names of federal law enforcement officers . . . routinely is upheld.").

As to weighing those privacy interests against the public interest, the FBI attests that it engaged in a balancing analysis and concluded that the agents' interest in privacy outweighed the public's interest in disclosure because disclosure of their names would "constitute a clearly unwarranted invasion of [the agents'] personal privacy" while "not significantly increas[ing] the public's understanding of the FBI's operations and activities." Hammer Decl. ¶ 10. The FBI also contends that any public interest in this case is limited to information "that would shed light on the FBI's performance of its mission and function" and that because Johnson was prosecuted by the State of Alabama rather than the federal government the identity of *federal* agents cannot advance that public interest. *Id.* ¶ 9.

For his part, Alper contends that there is another significant public interest at play in this case: he argues that disclosure "could support Johnson's claim of innocence," Pl.'s Renewed Mot. 2, and that the "significant public interest in information that 'could corroborate a death-row inmate's claim of innocence'" outweighs the private interests here, *id.* at 3 (quoting *Roth*, 642 F.3d at 1175). The FBI does not meaningfully respond to this public interest. *See generally* Def.'s Opp'n; Hammer Decl.

In *Roth v. U.S. Department of Justice*, 642 F.3d 1161 (D.C. Cir. 2011), the D.C. Circuit observed that there is "considerable public interest in the potential innocence of individuals sentenced to death" and held that this public interest is "substantial" for purposes of the Exemption 7(C) analysis, *id.* at 1176. Alper's supplemental declarations further substantiate that the public

6

has considerable interest specifically in Johnson's innocence claim. An "unprecedented number" of amici have filed briefs in Johnson's post-conviction case, Alper 2d Supp. Decl. ¶ 11; the lead prosecutor in Johnson's original criminal trial "firmly believes," in light of new information, that "Johnson should receive a new trial," *id.* at 2 n.4; Johnson's case has received attention from national and international media outlets, *id.* ¶ 12; prominent celebrities have publicly supported Johnson's innocence claim on social media, *id.* ¶ 13; and Johnson's case was the subject of a critically acclaimed podcast, *id.* ¶ 15, which was re-released in February 2026, and listened to by "hundreds of thousands of people," Alper 4th Supp. Decl. ¶ 2, Dkt. 30-1.

The Court must therefore balance the privacy interests of the FBI agents against the public's "compelling interest" in information that "could help exonerate a potentially innocent death-row inmate." *Roth*, 642 F.3d at 1178, 1181. Even in cases involving a *state* prosecution, the "fact that [a defendant] has been sentenced to the ultimate punishment strengthens the public's interest in knowing whether the FBI's files contain information that could corroborate his claim of innocence." *Id.* at 1176. In other words, disclosure is warranted when that information "would further the public's interest in revealing whether the FBI is withholding information that could corroborate the claim of innocence of a man whom it helped put on death row." *Id.* at 1183.

Alper has demonstrated that the information he seeks could corroborate Johnson's innocence claim. A 1997 FBI memo, disclosed to Alper with the authors' names redacted, concluded that a "retrial" of Johnson was "highly unlikely" and that it was also "highly unlikely" that Alabama would uncover sufficient new evidence that "would prove beyond a reasonable doubt the guilt" of Johnson. Alper 2d Supp. Decl. ¶ 22; *see id.*, Ex. A (redacted 1997 FBI memo). According to Alper, "we now know that the FBI had reached—before Johnson was even tried— the same conclusion that the current District Attorney has reached about the state of the evidence

7

against him."  Alper 2d Suppl. Decl. ¶ 22.  He attests that knowing the names of the FBI agents

who wrote this memo is "critical to corroborating Johnson's claim of innocence."  *Id.* ¶ 23; *see*

*also* Pl.'s Renewed Mot. 7 (The memo writers' "contemporaneous assessment that the evidence

was insufficient to prosecute Johnson would corroborate" the current Jefferson County District

Attorney's conclusion "that the case against Johnson has 'disintegrated.'").  Specifically, Alper

contends that "[i]dentifying the specific investigators" ties the memorandum's assessment to

"concrete evidence rather than speculation," Pl.'s Renewed Mot. 7, and disclosure of the redacted

names would "allow Johnson's counsel to narrow its investigation by focusing only on the FBI

agents who are likely to provide information that would corroborate Johnson's innocence," Alper

3d Suppl. Decl. ¶ 7, Dkt. 29-1.  In other words, with these names in hand, Alper can more diligently

and more credibly pursue Johnson's innocence claim.  The Court finds that the public interest here

outweighs the agents' privacy interests and will therefore order the FBI to disclose which agents

wrote the 1997 memorandum.[1]

A similar analysis would apply to the local law enforcement agents whose reports are cited

to support the FBI memorandum's conclusions.  *See* Alper 2d Suppl. Decl. ¶ 7 (seeking disclosure

of the "names of other law enforcement officers whose investigation" is cited as the basis for the

---

[1] Alper contends that the names of the FBI agents involved in Johnson's criminal case are already publicly available and well known.  *See* Pl.'s Renewed Mot. 7–8; Alper 2d Supp. Decl. ¶ 25.  In fact, in one of his supplemental declarations, Alper himself lists the names of the six "primary" FBI agents.  Alper 3d Supp. Decl. ¶¶ 4–6.  But the Court has already ruled that previous disclosure of the FBI agents' names does not destroy their privacy interests.  *See* Mem. Op. 8 (citing cases).  Further, the FBI neither denies nor confirms that the 1997 memorandum was prepared by FBI agents whose names are on Alper's list of six.  Because the Court finds that the public interest in Johnson's innocence claim outweighs the agents' interest in privacy, regardless of whether their names have previously been disclosed, it will order the FBI to disclose the agents' names.

FBI memorandum's conclusions).[2] The Court agrees that if the FBI memorandum relied on certain local investigatory documents that had concluded that the evidence against Johnson was weak, disclosure could advance Johnson's innocence claim. But the 1997 FBI memorandum itself does not explicitly cite any local reports that it relied on, nor does it appear to have redactions that appear to correspond to the names of local law enforcement officers. *See* Alper 2d Supp. Decl. Ex. A., at 1–2. And Alper does not identify any specific documents he wants unredacted. Thus, on this record, the Court cannot conclude that the public interest in the disclosure of unknown names in unidentified documents outweighs the private interest.

In sum, because the "public interest in the potential innocence of individuals sentenced to death," *Roth*, 642 F.3d at 1176, outweighs the FBI agents' interest in privacy, the Court will order the FBI to disclose the names of the agents who authored the 1997 memorandum.

*Ansley Documents*. Alper requests disclosure of the names of private individuals that are redacted in a set of documents related to witness Michael Ansley. Pl.'s Renewed Mot. 6; Alper 2d Supp. Decl. ¶ 7. Ansley is "a former professional basketball player who was present at the hotel within minutes" of the police officer's murder. Alper 2d Supp. Decl. ¶ 27. A man who "had threatened to kill Ansley" had been "originally charged" with the police officer's murder, and, according to Alper, Alabama authorities "believed that the murder of [the police officer] might have been an unintended casualty of a failed attempt to kill Ansley." *Id.* ¶ 28.

The documents released by the FBI reveal that the agency made efforts to interview Ansley, his wife, and his girlfriend. *Id.* ¶¶ 27–32. Alper contends that these records "point to the motive of another person to commit murder that night in the hotel parking lot," *id.* ¶ 32, and therefore

---

[2] As with the FBI agents, Alper attests that the local law enforcement officers' names are "well-known" and that "hundreds of their unredacted police reports have been disclosed over the years." Pl.'s Renewed Mot. 8.

corroborate Johnson's innocence claim, *id.* ¶ 30. He also contends that the requested information affects only a minor privacy interest because the names have already been publicly disclosed through other means. *Id.* ¶ 33. Again, the government does not meaningfully respond to Alper's arguments about the public interest in Johnson's innocence claim.

Civilian third parties have substantial privacy interests, *see Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995), and courts in this Circuit routinely protect the identify of informants and other non-law-enforcement individuals involved in investigations, *see, e.g.*, *Quiñon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1986). Generally, the names of private individuals are "categorically" exempt from disclosure, unless needed to confirm or refute illegal activity by the government. *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991).

But when a case involves a defendant sentenced to death, the Court must balance the public and private interests rather than categorically exempting names from disclosure. *See Roth*, 642 F. 3d at 1174. In *Roth*, which the Court discussed at length above, the D.C. Circuit carved out a death penalty exception to the general exemption rule. *See id.* at 1184 ("[W]here the FOIA requester has surmounted the fairly substantial hurdle of showing that a reasonable person could believe that the FBI might be withholding information that could corroborate a death-row inmate's claim of innocence, the balance militates in favor of fuller disclosure."); *see id.* at 1190 (Kavanaugh, J. dissenting in part) ("[T]he majority opinion . . . decree[s] a new death penalty exception that overrides Exemption 7(C)'s protection of personal privacy."). The Court will therefore balance the individuals' privacy interests against the public's interest in disclosure.

Alper contends that disclosure of these names could corroborate Johnson's claim of innocence. He argues that the Ansley documents identify another suspect for the hotel murder, which "would obviously corroborate Toforest Johnson's innocence claim." Alper 2d Supp. Decl.

¶¶ 29–30.  Alper attests—based on his review of the redacted Ansley documents together with other documents—that there had been a dispute between Ansley and a man named Quintez Wilson, who had threatened to kill Ansley.  *Id.* ¶¶ 28, 31.  Indeed Ansley, his wife Kimberly Ansley, and other witnesses "had advised police that Wilson had threatened to kill Ansley."  *Id.* ¶ 28.  Ansley and his girlfriend Monika Daniels were at the hotel the night of the murder, *id.* ¶¶ 27, 32, and Wilson had originally been charged in the murder of the police officer who "might have been an unintended casualty of a failed attempt to kill Ansley," *id.* ¶ 28.  After the murder, local authorities enlisted the FBI to conduct interviews with Ansley, Kimberly Ansley, and Monika Daniels.  *Id.* ¶¶ 29–32.

Because these documents concern "[e]vidence pointing to a different person who committed the murder," *id.* ¶ 30, including "the motive of [that] person to commit murder that night in the hotel parking lot," *id.* ¶ 32, the Court agrees that the disclosure of the redacted names in these documents could help corroborate Johnson's innocence claim.  Given the substantial public interest in corroborating the innocence claim of a man on death row—and considering the fact that these names are all already in the public record—the Court concludes that the public interest in disclosure outweighs the individuals' privacy interests.  *See Roth*, 642 F.3d at 1182.  Accordingly, the Court will order the FBI to disclose the redacted names in the Ansley documents.[3]

*Hotel Guests*.  The FBI has disclosed "the full substance" of multiple FBI interviews with guests who were staying at the hotel on the night of the murder, but it has redacted the names of the guests.  Pl.'s Renewed Mot. 10.  Alper contends that these interviews "could corroborate

---

[3] The Court also notes that Ms. Kimberly Ansley's privacy interests are diminished because she is deceased.  *See* Pl.'s Renewed Mot. 9; Alper 2d Supp. Decl. ¶ 31; Alper 3d Supp. Decl. 6 n.2 (providing a link to Ms. Ansley's obituary); *Schrecker v. DOJ*, 254 F.3d 162, 166 (D.C. Cir. 2001) (noting that "the death of the subject of personal information does diminish to some extent the privacy interest in that information, though it by no means extinguishes that interest").

Johnson's claim of innocence." *Id.* Moreover, Johnson's legal team already has a "complete, unredacted roster" of the hotel guests' names, room numbers, hometowns, and addresses. Alper 2d Supp. Decl. ¶ 35; *see id.*, Ex. J. Alper seeks the redacted names in the FBI interviews so that he can match guests with their respective statements. Alper 2d Supp. Decl. ¶ 37; Pl.'s Renewed Mot. 10.[4]

The FBI contends that disclosing this information "would not shed light on the FBI's performance of its mission and function" because the FBI only assisted local law enforcement and because state prosecutors, not the FBI, made the decisions leading to Johnson's conviction. Hammer Decl. ¶ 15. Again, the FBI does not meaningfully respond to Alper's asserted public interest in corroborating Johnson's innocence claim.

Disclosing the names of the hotel guests could corroborate Johnson's innocence claim by allowing Johnson's legal team to match guests' names with their respective statements. Alper attests that 25 FBI field offices across the country conducted interviews with hotel guests, Alper 2d Supp. Decl. ¶ 36, and that these interviews played a "significant" role in the FBI's "determination that Johnson could not and should not be further prosecuted," *id.* ¶ 37. The interviews reveal that "none of the hotel guests . . . implicated Johnson in any way." *Id.* "Although several of them heard shots and looked out the window, none of them saw a man matching Johnson's description or a car matching the description of the car Johnson was in that night." *Id.* That information, "while not proof of Johnson's innocence," could nonetheless "corroborate his innocence claim." *Id.* Although the names of the hotel guests are already public, matching the hotel guests to their respective FBI interviews would "serve to narrow further investigation on

---

[4] Alper also asserts that neither the local Alabama prosecutor's office nor the Alabama Attorney General's office redacted any of the documents related to hotel guests and "never expressed any concern about the public disclosure of the names of these witnesses." Alper 2d Supp. Decl. ¶ 38.

Johnson's behalf," allowing Alper and Johnson's legal team to identify the hotel guests who made the specific statements corroborating Johnson's innocence and pursue his innocence claim further. Alper 3d Suppl. Decl. ¶ 10. Since disclosure could corroborate Johnson's claim of innocence and the names of the hotel guests are already public, the Court concludes that the public interest outweighs the private interests, and additional disclosure is appropriate.

* * *

In sum, relying on the D.C. Circuit's decision in *Roth*, this Court has "engaged in the balancing contemplated by Exemption 7(C)" and concluded that "in the circumstances of this case," where Alper has shown that "a reasonable person could believe that the FBI might be withholding information that could corroborate a death-row inmate's claim of innocence, the balance militates in favor of fuller disclosure." *Roth*, 642 F.3d at 1184. Accordingly, the Court will order the FBI to disclose the names of its agents who drafted the 1997 memorandum; the redacted names in the Ansley documents; and the names of the hotel guests that match their witness statements.

### B. Exemption 5

Alper moves for reconsideration of the Court's ruling that the FBI "properly withheld [five documents] under Exemption 5 and the attorney-client privilege." Pl.'s Renewed Mot. 11. These documents contain communications between the FBI and DOJ counsel. *Id.*

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant," including the attorney work-

product, attorney-client, and deliberative process privileges.  *Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008).

The attorney-client privilege incorporated into FOIA Exemption 5 "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Touarsi v. DOJ*, 78 F. Supp. 3d 332, 345 (D.D.C. 2015) (citing *In Re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)).  In a governmental setting, the "client" may be the agency and its "attorney" the agency lawyer.  *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).

Alper contends that documents recently disclosed by the FBI pursuant to the Court's May 2025 Order warrant reconsideration of the Court's Exemption 5 ruling for two reasons.

First, Alper contends that by disclosing certain documents in response to the Court's Order, the FBI has waived any attorney-client privilege protecting the five documents it is withholding under Exemption 5.  He asserts that these recently disclosed files include "several memoranda that specifically discuss and summarize the nature of the communications between the FBI and DOJ counsel."  Pl.'s Renewed Mot. 12; *see also id.* at 12–13; Alper 2d Supp. Decl. ¶¶ 44–50.  He asserts that the FBI cannot invoke the attorney-client privilege to protect underlying communications where the FBI later disclosed summaries of those communications that "reveal[] the substance of DOJ's advice to the FBI, undercutting any claim that such information" remains privileged.  Pl.'s Renewed Mot. 14.  In other words, Alper contends that the withheld information is no longer confidential and therefore no longer protected by attorney-client privilege.  *Id.*; Alper 2d Supp. Decl. ¶ 51.

It is true that confidentiality must be maintained from the creation of the document to the present for the attorney-client privilege to remain intact.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  Here, the FBI attests that although the disclosed

summaries show that "the FBI consulted with DOJ counsel," they do "not reveal the specific details" of those communications or "disclose the specific guidance that DOJ counsel provided to the FBI." Hammer Decl. ¶ 18. Further, the FBI attests that the legal guidance "was not shared with or circulated to individuals outside the attorney-client relationship." *Id.*; *cf. Coastal States Gas Corp.*, 617 F.2d at 863 (An agency had not maintained confidentiality when "the evidence show[ed] no attempt . . . to protect [the documents] within the agency."). The FBI's declaration—which attests that the summaries, even if they reveal the topics about which legal advice was provided by DOJ counsel to the FBI, do not disclose the specific legal advice provided—is entitled to a presumption of good faith, *WP Co. LLC v. U.S. Small Bus. Admin.*, 575 F. Supp. 3d 114, 118 (D.D.C. 2021) (quoting *SafeCard Servs.*, 926 F.2d at 1200), and Alper does not successfully rebut this presumption, particularly on a motion for reconsideration.

Second, Alper contends that because the documents contain not only "legal advice" but also "strategic advice about inter-agency coordination," they cannot be withheld under Exemption 5. Pl.'s Renewed Mot. 15; Alper 2d Supp. Decl. ¶ 52. But when an agency lawyer operates in a "mixed capacity," the agency "must establish that securing legal advice was a 'primary purpose'" of the communication to invoke Exemption 5. *Cause of Action Inst. v. DOJ*, 330 F. Supp. 3d 336, 347 (D.D.C. 2018); *see also id.* at 348–49. The core question for this inquiry is whether "obtaining or providing legal advice was one of the significant purposes of the attorney-client communication." *In re Kellogg*, 756 F.3d 754, 760 (D.C. Cir. 2014). Even if Alper is correct that the documents were drafted in part for "strategic advice about inter-agency coordination," Pl.'s Renewed Mot. 15, courts cannot presume that a communication has only one primary purpose, *In re Kellogg*, 756 F.3d at 759–60. The communications are privileged so long as "at least 'one of the significant purposes' . . . was to obtain or provide legal advice." *FTC v. Boehringer Ingelheim*

15

*Pharm.*, 892 F.3d 1264, 1268 (D.C. Cir. 2018) (citation modified).  The FBI's declarations attest that the documents were made for "the purpose of securing legal assistance or advice in relation to government legal positions."  Hammer Decl. ¶ 18; Declaration of Michael G. Seidel ¶ 47, Dkt. 12-3.  Accordingly, reconsideration of the Court's Exemption 5 ruling is not warranted on this ground.

But even though the FBI has properly invoked Exemption 5 to withhold the five documents, it must still segregate and disclose non-privileged information.  *See Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) ("If a document contains exempt information, the agency must still release any reasonably segregable portion after deletion of the nondisclosable portions." (citation modified)).  An agency "cannot withhold an entire document [on the basis of attorney-client privilege] without describing the mix of privileged and non-privileged information and explaining why it would not be possible to simply redact the privileged materials."  *Jud. Watch, Inc. v. USPS*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004) (citation modified).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  Here, however, while Hammer declares that "the FBI determined that there is no further non-exempt information that can be reasonably segregated," Hammer Decl. ¶ 20, the FBI provides no details and does not address Alper's contention that the documents contain "strategic advice" that is segregable, Pl.'s Renewed Mot. 15–16; Alper 2d Supp. Decl. ¶ 53.  Accordingly, the Court will order the FBI to once again review the documents withheld under Exemption 5 and attest in greater detail about whether any non-privileged information therein, including nonlegal strategic advice, is segregable and disclosable to Alper.

### C. Undisclosed Documents

Finally, Alper contends that the FBI has not complied with the Court's May 27, 2025 Order by failing to disclose "three documents described in subparagraphs (a) through (c) on pages 1–2 of plaintiff's March 6, 2025, supplemental declaration." Pl.'s Renewed Mot. 16; *see* Alper 2d Supp. Decl. ¶ 54. Although Alper states that he "is already in possession of these documents" through other means, he contends that "the Bureau's failure to provide them raises concerns about the thoroughness of its review." Pl.'s Renewed Mot. 16. The FBI acknowledges that these documents "were related to the FBI investigation" but attests that they "were not found to be a part of the investigative file that was processed and released" to Alper. Hammer Decl. ¶ 19. Since Alper is in possession of the documents, no action by the Court is required.

## CONCLUSION

For the foregoing reasons, Alper's motion, Dkt. 26, is granted in part and denied in part. A separate order accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

May 14, 2026

17